MARK D. ROSENBAUM (SBN 59940)
mrosenbaum@publiccounsel.org
WILBERT H. WATTS (SBN 228350)
wwatts@publiccounsel.org
DEEPIKA SHARMA (SBN 256589)
dsharma@publiccounsel.org
SARAH E. TRUESDELL (SBN 258642)
struesdell@publiccounsel.org
ALISA L. HARTZ (SBN 285141)
ahartz@publiccounsel.org
MARTA A. EGGERS (SBN 307842)
meggers@publiccounsel.org
PUBLIC COUNSEL
610 S. Ardmore Avenue
Los Angeles, California 90005
Telephone:  (213) 385-2977
Facsimile:   (213) 385-9089

*Attorneys for Plaintiffs*

*Additional counsel listed following caption*

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

## CENTRAL DIVISION

| | |
|---|---|
| CORNELIA MARTINEZ, an individual; ANA VELASQUEZ, an individual; CARINA FABIAN, an individual; HILDA DERAS, an individual; CARMEN CASTRO, an individual; DEMETRIUS ALLEN, an individual; MICHAEL PRUDHOMME, an individual; ARTHUR RIVERA, an individual; JAMARCUS REYNOLDS, an individual; PEDRO RAMOS, an individual; MARGARITA MECINAS,  an individual; NICOLAS GREGORIO,  an individual; CARLOS ESCAMILLA, an individual; FRANCESCA ESCAMILLA, an individual; POLONIA HERNANDEZ, an individual; SAJE, a 501(c)(3) non-profit organization; STEP UP ON SECOND STREET, INC., a 501(c)(3) non-profit organization; on behalf of themselves and all others similarly situated, | CASE NO.:  2:16-cv-8598 **COMPLAINT FOR DAMAGES, DECLARATORY AND INJUNCTIVE RELIEF** **Jury Trial Demanded** |
| Plaintiffs, | |
| v. | |
| (Caption continues on next page) | |

OPTIMUS PROPERTIES, LLC, a California
limited liability company; ROXBURY
VENTURES, LLC, a California limited
liability company; SOUTH KENMORE
PROPERTIES, LLC, a California limited
liability company; SOUTH NORMANDIE
PROPERTIES, LLC, a California limited
liability company; NORMANDIE LINDEN,
LLC, a California limited liability company;
MAGNOLIA AVENUE PROPERTIES,
LLC, a California limited liability company;
MARIPOSA/8TH STREET PROPERTIES,
LLC, a California limited liability company;
and JEROME MICKELSON, an individual,

      Defendants.

MATTHEW E. SLOAN (SBN 165165)
matthew.sloan@skadden.com
EMILY LUDMIR AVIAD (SBN 251995)
emily.aviad@skadden.com
DANIEL O. BLAU (SBN 305008)
daniel.blau@skadden.com
ROSS M. CUFF (SBN 275093)
ross.cuff@skadden.com
RACHAEL T. SCHIFFMAN (SBN 292005)
rachael.schiffman@skadden.com
ANTONIETA M. PIMIENTA (SBN 304105)
antonieta.pimienta@skadden.com
SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
300 South Grand Avenue, Suite 3400
Los Angeles, California 90071-3144
Telephone:  (213) 687-5000
Facsimile:   (213) 687-5600

CHRISTOPHER BRANCART (SBN 128475)
cbrancart@brancart.com
BRANCART & BRANCART
8205 Pescadero Road
Loma Mar, California  94021
Telephone:  (650) 879-0141
Facsimile:   (650) 879-1103

ANNE P. BELLOWS (SBN 293722)
abellows@publicadvocates.org
PUBLIC ADVOCATES INC.
131 Steuart Street, Suite 300
San Francisco, California  94105
Telephone:  (415) 431-7430
Facsimile:   (415) 431-1048

Attorneys for Plaintiffs

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## **INTRODUCTION**

1.     In blatant violation of federal and state anti-discrimination laws, Defendants have engaged in concerted and unlawful efforts to push out tenants whom they consider to be undesirable—tenants with mental disabilities and Latino tenants with children—in order to raise the rents on those units, market the units to childless, English speaking, non-disabled people of means, and increase their profits on the rapid resale of the apartment buildings that Plaintiffs call home. Defendants have made their discriminatory intent explicit. They have said, in so many words, that "regular tenants" should not have to live near tenants with mental disabilities with their "symptoms" and "issues"; that they will call immigration on Latino tenants who challenged eviction notices; that the smells of Latino cooking are "disgusting" and "foul"; and that families whose children use common areas will be evicted.

2.     Against this backdrop of explicit discrimination and harassment, Defendants employ a number of pernicious, unlawful techniques to push out targeted tenants, as fully detailed below.

3.     Defendants are not only violating well-established rights protected by federal and state law; to turn a profit, they are putting at risk of displacement and even homelessness some of the most vulnerable Los Angeles residents: low-income individuals with mental disabilities, former foster youth, the formerly homeless, and Latino families living on the edge of poverty.

4.     The 15 individual Plaintiffs in this action are members of classes protected by the Fair Housing Act ("FHA"), 42 U.S.C. § 3601 *et seq.*—Spanish-speaking Latino tenants, tenant families with children, mentally disabled tenants— and two non-profit organizations serving those tenants, Step Up on Second Street, Inc. ("Step Up") and SAJE ("Strategic Alliance for a Just Economy").

5.     By this action, Plaintiffs seek to hold the tenants' landlords and management, a network of investors, owners, and operators of apartment buildings in the Koreatown neighborhood of Los Angeles, liable for discrimination in violation of the FHA and related state and local laws.

6.     Defendants are eight interrelated companies and individuals who have, since at least 2013, pursued what they have termed their "Koreatown Strategy" centered in Koreatown, a rapidly gentrifying neighborhood of Los Angeles. This strategy consists of purchasing occupied multiunit properties, instituting a discriminatory campaign to force out certain targeted tenants, renovating and re-renting vacated units, then selling or "flipping" the properties for a quick profit at the expense of the tenants they have ejected or sought to eject. The success of this scheme crucially depends on unlawfully displacing a significant number of the existing tenants of these properties.

7.     To accomplish this objective, Defendants have engaged in a pattern and practice of discriminatory conduct targeting and imposing disparate harm on protected classes under the FHA, including Spanish-speaking Latino tenants, tenant families with children, and tenants with mental disabilities. As detailed more fully below, Defendants' discriminatory and unlawful practices in violation of the FHA have included, among other practices, (1) subjecting Plaintiffs and similarly situated residents to coercive, unlawful and/or misleading notices designed to intimidate them into leaving; (2) changing the rent payment terms in a manner that makes it more difficult for Plaintiffs and similarly situated residents to pay their rent; (3) interfering with tenants' enjoyment of their housing rights through harassing tactics that include derogatory comments about their disability status or national origin; (4) instituting rules that restrict children from making reasonable use of common areas; (5) failing to provide or delaying needed maintenance and repairs to Plaintiffs' units, or providing only substandard maintenance and repairs, while at the same time providing freshly renovated units in good condition to new tenants; and (6)

instituting baseless eviction proceedings against targeted tenants. Moreover, Defendants have subjected Plaintiffs who have opposed Defendants' conduct to retaliation, threats, and intimidation, also in violation of the FHA.

8.      Defendants' conduct has caused profound injury to Plaintiffs. Plaintiffs have endured poor living conditions and humiliating treatment at the hands of Defendants' employees. Repeatedly, as a direct consequence of Defendants' persistent efforts to force them out, Plaintiffs have confronted the threat of losing their homes and becoming homeless. Plaintiffs with mental disabilities who have only recently achieved stability have been subjected to the stress of a difficult, high-stakes search for new housing in locations that would allow them to continue receiving essential services, before learning that the eviction threats were invalid. As a result, their symptoms were exacerbated. For many Plaintiffs, only the intervention of supportive non-profit organizations and pro bono counsel prevented them from losing their homes. As a direct result of Defendants' discriminatory and abusive actions, Plaintiffs have suffered significant anxiety, frustration, and fear, in addition to the violation of their civil rights.

9.      Organizational Plaintiffs Step Up and SAJE have also been harmed by the discriminatory and abusive conduct of Defendants. The efforts of Defendants to force out protected classes of tenants have frustrated the organizations' missions and interfered with their efforts to support vulnerable tenants in achieving stable, healthy living conditions. Both organizations have been forced to divert scarce resources to protecting tenants from a variety of discriminatory practices, as detailed below.

10.      Moreover, in retaliation for their efforts to assist tenants in exercising their housing rights, both organizations have encountered threats and intimidation from Defendants, as detailed below, in violation of the FHA.

11.      Plaintiffs seek a declaratory judgment, permanent injunctive relief, compensatory and punitive damages, and restitution for Defendants' unlawful behavior. This action is brought under the Fair Housing Act of 1968, as amended, 42

U.S.C. § 3601 *et seq.*; the California Fair Housing and Employment Act, California Government Code §§ 12900-12996; the Unruh Civil Rights Act, California Civil Code § 51; California Civil Code §§ 1714, 1927, 1940.2, 1942.5, 3479; the California Unfair Competition Law, California Business and Professions Code § 17200 *et seq.*; the Los Angeles Rent Stabilization Ordinance, L.A. Municipal Code § 151.00 *et seq.*; and California common law.

## JURISDICTION AND VENUE

12.    This Court has jurisdiction pursuant to 28 U.S.C. § 1331 and § 1343. This action is authorized by 42 U.S.C. § 3613. Declaratory relief is authorized by 28 U.S.C. § 2201 and § 2202. This Court has supplemental jurisdiction to consider state law claims pursuant to 28 U.S.C. § 1367.

13.    Venue is appropriate in this judicial district under 28 U.S.C. § 1391(b) because (1) at least one Defendant is a resident of this judicial district and all Defendants are residents of the State of California, and (2) a substantial part of the events or omissions giving rise to the claims in this Complaint occurred in this judicial district.

## THE PARTIES

### I.    The Individual Plaintiffs

14.    Plaintiff Cornelia Martinez, age 45, has been a resident of 1423 South Magnolia Avenue since 1999. She is Latina, her primary language is Spanish, and she has two minor children, ages 5 and 11, who live with her and her husband.

15.    Plaintiff Ana Velasquez, age 41, has been a resident of 1423 South Magnolia Avenue since 2010. She is Latina, her primary language is Spanish, and she has two minor children, ages 1 and 7, who live with her and her husband.

16.    Plaintiff Carina Fabian, age 29, has been a resident of 1423 South Magnolia Avenue since 2010. She is Latina, her primary language is Spanish, and she has one minor child, age 4, who lives with her, her husband, and her brother-in-law.

17.     Plaintiff Hilda Deras, age 76, has been a resident of 1423 South Magnolia Avenue since 1977. She is Latina and her primary language is Spanish.

18.     Plaintiff Carmen Castro, age 31, has been a resident of 1423 South Magnolia Avenue since 2011. She is Latina and lives with her husband and two minor children, ages 5 and 11.

19.     Plaintiff Demetrius Allen, age 45, has been a resident of 837 South Normandie Avenue since 2012. Allen, an African American who receives Supplemental Security Income ("SSI"), is a person with a disability under the FHA, 42 U.S.C. § 3602. Allen is a formerly chronically homeless individual under the Housing and Urban Development ("HUD") Code, 24 C.F.R. § 91.5.

20.     Plaintiff Michael Prudhomme, age 63, has been a resident of 837 South Normandie Avenue since 2008. Prudhomme is an SSI recipient and a person with a disability under the FHA, 42 U.S.C. § 3602.

21.     Plaintiff Arthur Rivera, age 67, has been a resident of 238 South Mariposa Avenue since 2011. Rivera, an SSI recipient, is a person with a disability under the FHA, 42 U.S.C. § 3602. He is a formerly chronically homeless individual under the HUD Code, 24 C.F.R. § 91.5.

22.     Plaintiff Jamarcus Reynolds, age 31, has been a resident of 238 South Mariposa Avenue since 2011. Reynolds is African-American, an SSI recipient, and a person with a disability under the FHA, 42 U.S.C. § 3602. He is a formerly chronically homeless individual under the HUD Code, 24 C.F.R. § 91.5.

23.     Plaintiff Pedro Ramos, age 45, has been a resident of 756 South Normandie Avenue since 1997. He is Latino, his primary language is Spanish, and he lives with his wife and two children, ages 6 and 11.

24.     Plaintiff Margarita Mecinas, age 34, has been a resident of 756 South Normandie Avenue since 2008. She is Latina, her primary language is Spanish, and she lives with her three minor children, ages 13, 16, and 17.

25.     Plaintiff Nicolas Gregorio, age 37, has been a resident of 756 South Normandie Avenue since 2005. He is Latino, his primary language is Spanish, and he lives alone.

26.     Plaintiff Carlos Escamilla, age 57, has been a resident of 250 South Kenmore Avenue since at least 1997. He is Latino, his primary language is Spanish, and he lives with his sister, Francesca, and elderly uncle, Juan.

27.     Plaintiff Francesca Escamilla, age 63, has been a resident of 250 South Kenmore Avenue since at least 1997. She is Latina, her primary language is Spanish, and she lives with her brother, Carlos, and elderly uncle, Juan.

28.     Plaintiff Polonia Hernandez, age 52, has been a resident of 250 South Kenmore Avenue since 1994. She is Latina and lives with her adult son.

## II.     <u>The Organizational Plaintiffs</u>

29.     Organizational Plaintiff SAJE is a 501(c)(3) non-profit organization located at 152 W. 32nd Street, Los Angeles, California. It has been in operation since 1996. SAJE educates tenants about their rights and works to enforce those rights. SAJE has been working with the tenants of 1423 South Magnolia Avenue for the past year and a half to address their housing-related issues. SAJE has had to divert significant resources, including staff time, to protect the tenants of 1423 South Magnolia Avenue from the Defendants' discrimination, including misleading notices, retaliatory evictions, and other forms of harassment.

30.     Organizational Plaintiff Step Up is a 501(c)(3) non-profit organization headquartered at 1328 2nd Street, Santa Monica, California. It has been in operation since 1984. Step Up provides social services to individuals with mental disabilities. Step Up helps to place persons with mental disabilities, including the formerly homeless, in permanent supportive housing. Step Up's social workers provide assistance to their clients in managing aspects of daily life. Step Up serves a number of clients living at 238 South Mariposa Avenue, including Plaintiffs Arthur Rivera and Jamarcus Reynolds. Step Up has had to divert significant resources, including

1  staff time, to protect the tenants of 238 South Mariposa Avenue from the

2  Defendants' discrimination, including misleading notices, threatened and attempted

3  evictions, and other forms of harassment.

4  **III.    The Defendants**

5          31.    Defendant Optimus Properties, LLC ("Optimus"), a California limited

6  liability company, is a privately held real estate investment company engaged in the

7  acquisition, development, leasing and management, and sale of multi-family, retail

8  and commercial real estate.

9          32.    Defendant Roxbury Ventures, LLC ("Roxbury"), a California limited

10 liability company, is a privately held real estate investment company engaged in the

11 acquisition, development, leasing and management, and sale of multi-family real

12 estate. It provides some of these services for the subject premises.

13         33.    Defendant South Kenmore Properties, LLC, a California limited

14 liability company, is the owner of 250 South Kenmore Avenue, having acquired the

15 building in 2014.

16         34.    Defendant South Normandie Properties, LLC, a California limited

17 liability company, owned 756 South Normandie Avenue from approximately May

18 2014 until approximately November 2016.

19         35.    Defendant Normandie Linden, LLC, a California limited liability

20 company, is the owner of 837 South Normandie Avenue, having acquired the

21 building in 2015.

22         36.    Defendant Magnolia Avenue Properties, LLC, a California limited

23 liability company, owned 1423 South Magnolia Avenue from approximately March

24 2015 until approximately September 2016.

25         37.    Defendant Mariposa/8th Street Properties, LLC, a California limited

26 liability company, is the owner of 238 South Mariposa Avenue, having acquired the

27 building in 2014.

28

38.     Defendant Jerome Mickelson is the Multi-Family Asset Manager/Director of Construction for Optimus. Mickelson is responsible for all housing policies for Defendants South Kenmore Properties, LLC, South Normandie Properties, LLC, Normandie Linden, LLC, Magnolia Avenue Properties, LLC, and Mariposa/8th Street Properties, LLC (together, the "Property Entities") and for Defendant Optimus.

**IV.    The Optimus Entities**

39.     Optimus is a vehicle for identifying, assessing, and aggregating potential real estate investments. Optimus, for example, promotes on its website many Koreatown properties that it presents as being in its "portfolio" of investments.

40.     Rather than own the properties outright, the properties in which Optimus invests are owned by companies controlled by Optimus' principals. These companies include the Property Entities.

41.     In order to manage the properties, Optimus and the Property Entities rely on the services of Roxbury. Notices to tenants are often on Roxbury stationery, for example.

42.     Defendant Mickelson is a key figure in these efforts. Mickelson has authority over the relevant housing policies at the subject properties and oversees the related practices.

43.     Each one of Defendants Optimus, Roxbury, and the Property Entities is an agent, servant, employer, partner, owner or subsidiary, alias, assignee, and/or alter-ego of the other remaining Defendants, is acting within the purpose or scope of such relationships and has acted within that purpose at all relevant times, and is engaged in a joint venture.

44.     Roxbury and the Property Entities are mere instrumentalities of Optimus, and Optimus is involved in the day-to-day ownership and management of the subject properties.

45.     Optimus does not respect the separate identities of Roxbury and the Property Entities. There is overwhelming overlap of employees, office space, and payment of salaries among the Defendants, including as follows:

(a)     Mickelson serves as the Multi-Family Asset Manager/Director of Construction for the properties owned by the Property Entities. His employer is Optimus, and he is paid by Optimus.

(b)     Optimus and Mickelson directly supervise the on-site managers of the relevant properties.

(c)     Individuals performing work for the Property Entities and Roxbury use their Optimus email address and represent themselves as being from Optimus rather than the Property Entities or Roxbury.

(d)     Individuals employed by Optimus send building management communications to tenants on Roxbury letterhead.

(e)     The Property Entities send building management communications to tenants on Optimus letterhead.

(f)     Optimus shares an office with Roxbury and the Property Entities. That shared office address is 1801 Century Park East, Suite 2100, Los Angeles, CA 90067.

(g)     Optimus shares its accounting department with the Property Entities, managing the receipt of payments and the disbursement of funds to its individual vendors and employees.

(h)     Optimus represents itself on its webpage as owning the relevant properties, and also lists an Optimus email address as the contact for the individual properties.

(i)     All of the entities list as their agent for service of process the same individual, Kamyar Shabani.

46.     Mariposa/8th Street Properties, LLC, is undercapitalized. Mariposa/8th Street Properties, LLC, represented that it did not have the funds to pay $3,881.25 in

Complaint

discovery sanctions or to pay the regular expenses of the building at 238 South Mariposa Avenue.

47.     Optimus employees, the Property Entities, and Roxbury act as agents for the principal, Optimus, when dealing with the relevant properties.

48.     Optimus derives financial benefit from the Property Entities and Roxbury. It controls, ratifies, or approves the actions of those entities.

49.     A joint venture exists between and among the Defendants. The Defendants have combined their property, skill, and knowledge with the intent to carry out a single business undertaking. To carry out the joint venture of acquiring, renovating, and managing properties, Optimus brings to the venture its access to capital, its market expertise, and its employees, including Mickelson. Roxbury brings its managerial expertise. The Property Entities bring to the venture the legal capacity to hold the relevant properties. These business entities and individuals together have a common business interest, the business of real property investment.

## FACTS

### I.     The "Koreatown Strategy"

50.     Since 2013, Defendants have pursued their so-called "Koreatown Strategy," a complex scheme in the rapidly gentrifying Koreatown neighborhood of Los Angeles, to purchase buildings, displace the existing tenants, renovate vacated units, market the renovated units at much higher rents to young, childless, English-speaking professionals, and "flip" (as defined below) the buildings at a massive profit.

51.     Koreatown is ripe for exploitation under Defendants' "Koreatown Strategy." Located near downtown, Mid-Wilshire, and Hollywood, the neighborhood has historically been characterized by dilapidated but architecturally distinct housing stock, relatively low rents affordable to the neighborhood's working-class residents, and significant ethnic and racial diversity, with particularly high numbers of Asian American and Latino families. In recent years, because of the area's proximity to job

centers, high quality public transit, vibrant culture and street life, comparatively low housing prices, and historical buildings of significant architectural value, Koreatown has attracted an influx of higher-income residents who are able to afford much higher rents.

52.    Each building purchased by Defendants was, at the time of purchase, occupied by significant numbers of Spanish-speaking Latino tenants, families with children, and/or persons with mental disabilities. Each of these groups is a protected class under the FHA.

53.    Under the protections of the Los Angeles Rent Stabilization Ordinance ("LARSO"), these preexisting tenants occupied rent-stabilized units, were protected from no-cause evictions, and paid below-market rents.

54.    Plaintiffs allege, based on information and belief, that the extraordinary profits that Defendants achieved through their Koreatown Strategy were attained as a direct result of their willingness to evade and break the law. Law-abiding real estate investors in the multi-family residential sector have traditionally relied on renovations, improved management, and legal rent increases to increase rental income, which, in turn, increases property value over time. However, rather than hold a property on a long-term basis, Defendants quickly dispose of the property by implementing a "flip": a short-term strategy that entails purchasing an apartment building and then rapidly taking steps to increase rents, followed by a sale shortly after the property is purchased.

55.    Having changed the demographic served by the buildings, and made upgrades only to the units repopulated with more desirable tenants, Defendants are able to sell the buildings for a considerable profit.

56.    For example, on December 31, 2014, Defendants announced the sale of 3715 West First Street, a 55-unit property "in the gentrifying Los Angeles neighborhood of Koreatown" for $7 million. Defendants stated that after updating

only "[a]pproximately 36 percent of the units," they were able to sell the property for a 70% return on the initial investment.

57.     Plaintiffs allege, based on information and belief, that Defendants purchased other properties—including the properties identified in this Complaint—with the intent of effecting the same scheme and then "flipping" the properties at a substantial profit.

58.     On March 18, 2015, Defendants announced their $2.25 million acquisition of 1423 South Magnolia Avenue, a 24-unit property "situated between gentrifying Korea Town and the University of Southern California." Defendants planned "extensive renovations," but stated that individual units would only be renovated "as they become vacant."

59.     Similarly, Defendants announced on April 8, 2015 their $2.2 million acquisition of 837 South Normandie Avenue, a 16-unit property in Koreatown. Defendants again planned "extensive renovations," but said they would only renovate individual units "as they bec[a]me vacant." Defendants stated that "[t]his asset fits nicely into our Koreatown Strategy."

60.     The steps Defendants take to increase the value of their new properties primarily involve efforts to drive out existing tenants who are members of protected classes under the FHA. Defendants have exhibited a clear pattern and practice of discriminatory, unlawful, and abusive treatment of these tenants, with the obvious goal of displacing them.

61.     First, Defendants repeatedly present targeted tenants with notices of termination or stipulations of eviction that have no actual legal basis but that appear to non-lawyers—all the more so to those with mental disabilities or those with no or limited ability to read English—as legally binding. Having misrepresented eviction as a *fait accompli*, Defendants are able to achieve the removal of many of the targeted tenants. Only because of the intervention, sometimes belated, of advocates and attorneys did Plaintiffs learn that the notices were invalid and that they did not

need to find a new home. Defendants also invent pretextual reasons for eviction, such as the presence of a dog that had been permitted for years or decades before.

62.     Second, Defendants make timely payment of rent increasingly difficult for targeted tenants, while also instituting draconian deadlines for receiving payments and then threatening eviction based on allegedly late payment of rent. Defendants achieve this in part by eliminating on-site payment options, including payment by drop-box or payment to an on-site manager, and instead requiring payment by mail, in person at Defendants' offices in Century City (approximately ten miles away), or through an online system. These new payment methods impose disproportionate hardship on Defendants' Latino tenants, tenant families with children, and disabled tenants, who commonly lack access to banks and to the internet and are therefore forced to rely on the more costly methods of personally traveling to Defendants' offices or obtaining money orders and purchasing mailing protections like certified and registered mail. Additionally, the strict policy requiring rent to be paid on the first of the month causes hardship to disabled tenants who rely on disability-related checks that typically arrive between the 1st and the 5th of the month.

63.     Third, Defendants' property managers frequently engage in verbal harassment of Spanish-speaking tenants, tenants with disabilities, and families with children based on their protected status. For example, as described below, Defendants have told mentally disabled tenants and their social workers that they don't want to rent to people with mental disabilities, that they should move, and that they belong in group homes. Defendants have also told Latino tenants that their food smells "disgusting" and "foul" and that the tenants need to learn to read English since they are in America. In other cases, Defendants have threatened to evict tenants because their children spend time in common areas. All of these measures taken by Defendants have frightened and aggravated tenants, creating a hostile and threatening environment and increasing pressure on them to move.

64.     Fourth, Defendants allow the units occupied by Spanish-speaking Latino tenants, tenant families with children, and mentally disabled tenants to remain in poor condition by refusing or delaying needed maintenance, or by providing substandard workmanship, fixtures, and repairs. Despite Plaintiffs' repeated requests, Defendants fail to correct, or unreasonably delay the correction of, deplorable conditions. At the same time, Defendants renovate newly empty units and advertise them on websites aimed at their target population: persons who are upwardly mobile, childless, English speaking, and without mental disabilities. The process of selectively upgrading the units contributes to Defendants' scheme to displace existing residents. As their buildings become long-term construction sites, life is made even more difficult for those tenants deemed undesirable, who experience none of the benefits from the constant work being performed to upgrade the other units. For example, frequent water shutoffs in many of the buildings, including as many as 50 hours without water over a four-month period, aggravate the tenants' daily lives.

65.     Fifth, Defendants impose invalid rent increases by raising rents in excess of the amount permitted by LARSO, violating the procedure for rent increases for Section 8 tenants, and unlawfully shifting the costs of utilities to tenants in violation of LARSO.

66.     When these methods fail, Defendants resort to issuing repeated and baseless eviction notices for the sole purpose of harassing and intimidating tenants, and sometimes pursuing meritless and/or retaliatory unlawful detainer actions (*i.e.*, eviction proceedings), until the targeted tenants make a legal misstep or simply give up and leave.

67.     Finally, part of Defendants' Koreatown Strategy is targeted marketing to tenants who are young, childless, English-speaking professionals without disabilities. Defendants market unlawfully vacated dwellings in a manner calculated to replace Latino families with children or persons with disabilities with nondisabled, single, young, English-speaking tenants. Through statements and marketing,

Defendants seek to induce new residents into (and dissuade former residents from) renting the newly vacated units by representations regarding the entry or prospective entry into the neighborhood of persons of a particular familial status, national origin, or disability-status.

68.    Defendants advertise the newly vacated units through the internet. The principal websites used by Defendants are Radpad, Hotpads, and, to a lesser extent, Walk Score. Each website presents information solely in English, and each is carefully curated to target young, English-speaking, single, nondisabled persons. Walk Score targets its marketing of multi-family dwelling units to millennials. Radpad features testimonials from young, single persons who are overwhelmingly white.

**II.    Federal, State, and Local Housing Laws That Protect Plaintiffs**

69.    Defendants' practices violate federal, state and local housing laws.

70.    The Fair Housing Act, 42 U.S.C. § 3601 *et seq.*, makes it unlawful to, *inter alia*, (1) deny rental housing or make rental housing unavailable to any person because of race, national origin, familial status, or disability status; (2) discriminate against any person in the terms, conditions, or privileges of a rental, or in the provision of housing services or facilities, because of race, national origin, familial status, or disability status; (3) for profit, to induce or attempt to induce any person to sell or rent any dwelling by representations regarding the entry or prospective entry into the neighborhood of a person or persons of a particular race, familial status, handicap, or national origin; or (4) coerce, intimidate, threaten, or interfere with any person in the exercise or enjoyment of the equal housing rights granted or protected by the FHA. 42 U.S.C. §§ 3604, 3617. The FHA also prohibits retaliation against persons who exercise their equal housing rights, or who aid or encourage others in exercising their equal housing rights.

71.    Tenants are also protected from discrimination on the basis of race, national origin, disability status, and familial status by state statutes, including

California's Fair Employment and Housing Act (FEHA), Cal. Gov't Code § 12900 *et seq.*, and the Unruh Civil Rights Act, Cal. Civ. Code § 51.

72.    Tenants also enjoy robust tenant protections under local laws. Under LARSO, the City of Los Angeles caps rental rate increases, proscribes changes in the terms of tenancy, and limits the grounds on which a landlord is permitted to evict existing tenants. L.A. Mun. Code §§ 151.01 – 151.30. Each of the buildings at issue in this Complaint, which was purchased by Defendants as part of their Koreatown Strategy, is subject to LARSO.

73.    Further, California law secures tenants' rights to safe, habitable living conditions and their ability to maintain their tenancies free from harassment, threats, and unfair business practices. Tenants are protected by a statutory cause of action that affords additional relief if the landlord fails to remedy substandard conditions after receiving notice from a public official of the need to repair the substandard conditions or abate the nuisance. Cal. Civ. Code § 1942.4. California law also protects tenants against interference with the quiet enjoyment of their homes, retaliatory evictions, and harassment intended to coerce and intimidate tenants into vacating their homes. Cal. Civ. Code §§ 1927 (breach of quiet enjoyment), 1942.5 (retaliatory eviction), 1940.2 (anti-harassment statute), 52.1 (Bane Act, outlawing coercion and intimidation). Finally, as consumers of housing, tenants are also protected from illegal, unfair, and deceptive business practices causing economic injury. Cal. Bus. & Prof. Code § 17200 *et seq.* (Unfair Competition Law).

74.    Unscrupulous investors like Defendants, who are willing to break the law, have lucrative opportunities to buy relatively low-priced, rent-stabilized properties, unlawfully remove tenants, quickly raise rents, and achieve extraordinary profits.

## III.    238 South Mariposa Avenue

75.    Since July 18, 2014, Defendant Mariposa/8th Street Properties, LLC has owned the apartment building at 238 South Mariposa Avenue in Los Angeles (the

"Mariposa building"). Built in 1928, the Mariposa building is a four-story, 40-unit structure consisting of 32 studio apartments and eight one-bedroom units. Defendant Mariposa/8th Street Properties, LLC paid $3,835,000 for the building. Defendant Roxbury provides management services for the Mariposa building on behalf of Defendant Mariposa/8th Street Properties, LLC, and Defendant Optimus.

76.    After their purchase of the Mariposa building, Defendants[1] immediately set to work increasing the value of the building so that they could flip it for a large profit. In this building, Defendants focused their efforts on removing tenants with mental disabilities.

77.    At the Mariposa building, Defendants discriminated against Plaintiffs primarily on the basis of their disability, explicitly telling Plaintiffs that individuals with mental illness "sometimes hang out with a negative or lower class element of people." To push out Plaintiffs, Defendants used the following tactics, among others: issuing repeated baseless eviction notices, making threatening and discriminatory statements, and refusing reasonable accommodations. As a result of Defendants' actions, Plaintiffs have suffered emotional distress, incurred additional costs to pay their rent, and have had their ability to remain in their homes threatened. Organizational Plaintiff Step Up has diverted scarce resources to defending against these tactics.

78.    In this property, Defendants have repeatedly engaged in unlawful treatment of tenants with mental disabilities who are clients of Plaintiff Step Up. With respect to three tenants—non-Plaintiff D. R. and Plaintiffs Jamarcus Reynolds and Arthur Rivera—Defendants ignored or actively sought to undermine the reasonable accommodations Step Up had obtained or requested for its disabled clients. Defendants consistently and repeatedly ignore and fail to comply with

---

[1] For purposes of this section regarding the Mariposa building, "Defendants" refers to Defendant Optimus, Defendant Roxbury, Defendant Jerome Mickelson, and Defendant Mariposa/8th Street Properties, LLC.

requests to contact Step Up caseworkers regarding any issues related to their clients' tenancies—even when those requests are clearly identified as reasonable accommodation requests under fair housing law. Instead, they direct misleading or harassing notices to Step Up's mentally disabled clients. Defendants have even directed threats at a Step Up caseworker in retaliation for her advocacy for a client's housing rights.

79.     As described below, Defendants' unlawful conduct at the Mariposa building has harmed Plaintiffs Reynolds and Rivera and has frustrated Step Up's mission of securing stable housing and providing supportive services for their disabled, formerly homeless clients. As a result, Step Up's caseworkers have been forced to divert significant time and resources to assist clients by communicating with building management, responding to Defendants' unlawful attempts to terminate the clients' tenancies, and asserting and reasserting their clients' right to a reasonable accommodation for their disabilities.

### ***Step Up***

80.     Step Up has been forced to divert significant time and resources to advocate for D. R., a nonparty mentally disabled individual and a formerly homeless youth who grew up in the foster care system.

81.     D. R. has lived at the Mariposa building since February 2014.

82.     After Defendant Mariposa/8th Street Properties, LLC purchased the Mariposa building in July 2014 and installed Briana Kelly as manager, Step Up caseworker Emily James contacted Kelly and introduced herself as D. R.'s caseworker. James informed Kelly that D. R. was part of Step Up's program with the Department of Mental Health, gave Kelly her contact information, and told Kelly she was available to help resolve any issues or concerns with her tenancy.

83.     In or around November 2014, D. R. received an eviction notice from Defendants that purported to terminate her Section 8 tenancy and to require her to vacate her unit within 90 days of receiving the notice ("Section 8 Termination

1   Notice"). Plaintiffs Jamarcus Reynolds and Arthur Rivera also received Section 8

2   Termination Notices around the same time as D. R.

3       84.    These Section 8 Termination Notices were illegal, as landlords are

4   prohibited under LARSO from unilaterally terminating tenancies without legal

5   cause, and from terminating participation in the Section 8 program without legal

6   cause to evict a tenant relying on a Section 8 voucher. The Section 8 Termination

7   Notices provided no cause for termination.

8       85.    Defendants did not directly notify Step Up about the purported

9   termination of its clients' tenancies at the time the notices were served.

10      86.    When James learned of D. R.'s Section 8 Termination Notice, she was

11  forced to devote her time to communicating with Defendants and the Housing

12  Authority of the City of Los Angeles ("HACLA") in order to defend D. R.'s right to

13  continue her tenancy. James assisted D. R. with sending a letter to Defendants, dated

14  December 29, 2014, explaining that the Section 8 Termination Notice was unlawful.

15      87.    Defendant Mickelson later explained to James that Defendants were

16  terminating Section 8 tenancies because he believed these tenants were very difficult

17  to work with due to substance abuse and/or mental health issues.

18      88.    Undeterred, Defendants continued their efforts to remove D. R. from the

19  Mariposa building. Over the next few weeks, Defendants tried to force D. R. to agree

20  to move out and have an eviction judgment entered against her and falsely informed

21  her that if she did not move out she would lose her Section 8 voucher.

22      89.    In response to Step Up's efforts to render assistance to D. R. and other

23  tenants, on March 10, 2015, Defendant Mickelson made an angry and threatening

24  phone call to James. On the call, Mickelson yelled at James, threatened to force out

25  all of Step Up's clients, stated that individuals with mental illness "sometimes hang

26  out with a negative or lower class element of people," and suggested that "regular

27  tenants" should not be forced to live near tenants like Step Up's clients. Mickelson

28  also threatened to call James' boss, to go to the buildings that Step Up manages to

1  "make a scene" and harass the tenants at those buildings to see how Step Up liked it,

2  and to personally go to Step Up's offices every day for a week.

3      90.    On April 9, 2015, Defendant Mariposa/8th Street Properties, LLC

4  served an eviction notice on D. R., citing an off-site behavioral incident that occurred

5  on April 8, 2015. D. R.'s counsel sent a letter to Defendant Mariposa/8th Street

6  Properties, LLC's counsel requesting a reasonable accommodation based on D. R.'s

7  disability in the form of rescission of the eviction notice. The request for

8  accommodation was supported by a detailed letter from D. R.'s psychiatrist.

9      91.    Defendant Mariposa/8th Street Properties, LLC refused to rescind the

10 notice or to provide a reasonable accommodation, and instead immediately filed an

11 unlawful detainer action against D. R.

12     92.    On July 23, 2015, the Superior Court for the County of Los Angeles

13 granted D. R.'s motion for summary judgment on the basis that Defendant

14 Mariposa/8th Street Properties, LLC's failed to engage in the interactive process

15 with D. R. regarding her reasonable accommodation request—a process required by

16 fair housing law.

17     93.    In her work with D. R., James has observed that Defendants' unlawful

18 conduct has worsened D. R.'s mental condition, exacerbating her disability and

19 reversing the progress she initially made upon securing housing at the Mariposa

20 building.

21     94.    If D. R. were to lose her housing at the Mariposa building, it would be

22 extremely difficult for Step Up to locate and secure alternative housing accessible to

23 Step Up's offices, making it much harder for the organization to provide D. R. with

24 the level of consistent support that she needs.

25                    ***Jamarcus Reynolds***

26     95.    Plaintiff Jamarcus Reynolds has lived at the Mariposa building since

27 November 2011. Reynolds, who has a mental disability, receives a monthly income

28 of $889.40 in SSI benefits and participates in the Section 8 program.

96.     As detailed below, since Defendants took possession of the Mariposa building, they have served Reynolds with multiple intimidating and unlawful notices apparently designed to pressure him into vacating his unit, attempted to illegally raise his rent, and verbally sought to pressure him into leaving. Defendants also made humiliating and harassing remarks to Reynolds about his disability status, and they have ignored and failed to comply with his request for a reasonable accommodation of his disability.

97.     Reynolds was chronically homeless from approximately 2005 to 2009. In 2009, after becoming a Step Up client, Reynolds was placed in transitional housing paid for by Step Up.

98.     Reynolds has participated in Step Up's Full Service Partnership ("FSP") adult program since August 2011. This program is designed to assist adults who are or were once homeless, and who are affected by a serious mental health issue. As a member of the FSP program, Reynolds receives intensive case management through a team of professionals, including social workers, therapists, psychiatrists, and nurses.

99.     Since moving into stable housing at the Mariposa building in November 2011, Reynolds has experienced a marked improvement in his mental condition and in his ability to engage in treatment. Living at the Mariposa building has also provided Reynolds with a sense of safety that he never felt while homeless.

100.   At the time he moved into the Mariposa building, Reynolds' Step Up social worker explained the Step Up program to the former landlord and asked that the landlord contact her directly if there were any issues with Reynolds' tenancy so that she could work to resolve these issues. For the first three years of Reynolds' tenancy, while the Mariposa building was owned and run by the former landlord and management, Step Up did not receive any major complaints or notices about Reynolds.

101.   Around September or October of 2014, two to three months after Defendant Mariposa/8th Street Properties, LLC acquired the Mariposa building, Reynolds' Step Up social worker introduced herself to Kelly, the new on-site manager, explained the FSP program, and told Kelly that she was available as needed to help resolve any issues or concerns that might arise during Reynolds' tenancy.

102.   In or around November 2014, Reynolds received the same Section 8 Termination Notice that D. R. received. Defendants did not inform Reynolds' social worker of this notice, nor had Step Up received any complaints about Reynolds from any of the Defendants prior to his receipt of the eviction notice.

103.   Because she believed, at first, that the Section 8 Termination Notice was valid and legal, Reynolds' social worker worked with Reynolds to complete the steps required by HACLA to request a voucher allowing him to move. Once Reynolds received the new voucher, he had only two months to find a new apartment. Reynolds and his social worker struggled to find a new apartment in Koreatown or another neighborhood of Los Angeles that would allow Reynolds to stay connected to his case management team at Step Up. Reynolds obtained a 30-day extension from Defendants, but finding an apartment continued to prove very difficult.

104.   The search for housing and the thought of becoming homeless as a result of being unable to find housing caused Reynolds tremendous anxiety and fears for his physical safety.

105.   After learning in February 2015 that the Section 8 Termination Notice was, in fact, illegal, Reynolds sent Defendant Mariposa/8th Street Properties, LLC a letter explaining that the Section 8 Termination Notice from November 2014 was invalid and that he intended to protect his rights as a tenant.

106.   Around late February or early March of 2015, Kelly told Reynolds that Defendants would give certain tenants money to help them move, and threatened Reynolds by falsely stating that if he did not move, he could lose his Section 8

1   voucher. On a separate occasion in March 2015, Kelly told Reynolds that Section 8

2   tenants were "difficult" and "would not listen."

3       107.   Also in early 2015, Kelly told Reynolds that Defendants would no

4   longer be renting to disabled persons.

5       108.   On March 31, 2015, one of Reynolds' attorneys sent Defendant

6   Mariposa/8th Street Properties, LLC's counsel a reasonable accommodation request

7   based on Reynolds' disability, asking that Defendant send all notices and letters

8   given to or served on Reynolds to his social worker, and contact his social worker

9   with any potential issues regarding Reynolds' tenancy.

10      109.   In April 2015, Kelly asked Reynolds whether he was moving out of the

11  apartment. When Reynolds explained that he was staying in his apartment, Kelly told

12  him that some tenants needed to leave because they had "symptoms" and "issues."

13      110.   On or around April 16, 2015, Defendants sent Reynolds an eviction

14  notice premised on allegedly unpaid rent, even though Reynolds was current on his

15  rent. In addition, despite his counsel's reasonable accommodation request that

16  Reynolds' social worker receive all notices regarding Reynolds' tenancy, Defendants

17  did not provide a copy of this notice to his social worker or to anyone else at Step

18  Up.

19      111.   On or around April 27, 2015, Defendants sent Reynolds another

20  notice—this time, a 30-day notice to change the terms of his rental agreement by

21  increasing his monthly rent. Again, contrary to Reynolds' reasonable

22  accommodation request, Defendants did not provide a copy of this notice to

23  Reynolds' social worker. Moreover, his social worker verified that the rent increase

24  had not been submitted to, much less approved by, HACLA, and that it was therefore

25  invalid.

26      112.   On or around May 5, 2015, Step Up received a letter from Francesca

27  Carpello, a property manager for Optimus who at times represented herself as an

28  employee for Roxbury, explaining that Reynolds' rent check was being returned.

1    According to Carpello, because the check that Step Up had submitted covered rent

2    for both Reynolds and a tenant who at the time was involved in an unlawful detainer

3    proceeding, Defendants could not accept payment. In response to this letter,

4    members of Step Up's money management program drafted another check solely for

5    Reynolds' rent in the amount of $250.61 that was mailed out on May 14, 2015.

6    113.   On or around May 13, 2015, Reynolds received an eviction notice

7    demanding that he pay a total sum of $354.56 or be evicted from the property.

8    Again, contrary to Reynolds' reasonable accommodation request, Defendants did not

9    send a copy of this notice to his social worker or to anyone else at Step Up.

10   Moreover, because the rent increase had not been submitted to or approved by

11   HACLA, it was illegal.

12   114.   On or around May 18, 2015, Reynolds' social worker emailed

13   Defendant Mickelson, informing him that none of the notices Reynolds had received

14   were in compliance with the reasonable accommodation request made at the end of

15   March 2015. She also informed him that she had spoken with Reynolds' HACLA

16   caseworker, who had told her that any rent increase was illegal.

17   115.   From the time Defendant Mariposa/8th Street Properties, LLC took over

18   the Mariposa building and began sending Reynolds threatening and illegal notices

19   with the apparent purpose of forcing him out of the building, among other

20   discriminatory practices, Reynolds' disabilities have been aggravated, causing him to

21   suffer both physically and emotionally as a result of Defendants' actions.

22   116.   Step Up has had to divert significant time, effort, and expense helping

23   Reynolds combat Defendants' unlawful eviction notices and other discriminatory

24   actions.

25   117.   Given the difficulty of finding buildings that are willing to accept

26   Section 8 vouchers, if Defendants' unlawful actions continue and Reynolds is forced

27   out of the Mariposa building, it is extremely unlikely that Step Up will be able to

28

1  find Reynolds another unit in a neighborhood in which he feels safe, and he might

2  well become homeless again.

3      *Arthur Rivera*

4      118.   Plaintiff Arthur Rivera has lived at the Mariposa building since

5  December 16, 2011. He is mentally disabled and a longtime client of Step Up.

6      119.   As detailed below, since Defendants took possession of the Mariposa

7  building, they have served Rivera with a series of intimidating and unlawful notices,

8  including multiple baseless eviction notices, apparently designed to pressure him into

9  vacating his unit. They have also ignored and failed to comply with his requests for a

10  reasonable accommodation of his disability, sought to impose an unlawful rent

11  increase, and changed the rent payment terms in a manner that made it more difficult

12  for him to pay rent.

13      120.   Before moving to the Mariposa building, Rivera had been homeless

14  since the 1970s.

15      121.   In 2011, Step Up helped Rivera to obtain a Section 8 voucher, which

16  allowed him to move into the Mariposa building. Rivera got along well with the

17  management at the time he moved in.

18      122.   In or around November 2014, Rivera received the same unlawful

19  Section 8 Termination Notice that Reynolds and D. R. both received, purporting to

20  terminate Rivera's Section 8 tenancy.

21      123.   Sometime after receiving the Section 8 Termination Notice, Rivera

22  received a coercive and misleading notice from Defendants stating, without legal

23  basis, that he had a "move-out date" of January 9, 2015.

24      124.   On February 3, 2015, Rivera received an eviction notice stating that he

25  was being evicted because he had played music in the mid-afternoon on a small

26  stereo with no external speakers. A neighbor from across the hallway has stated that

27  the music was not loud.

28

125.   The next day, on February 4, 2015, Rivera sent Defendant Mickelson a letter explaining that the Section 8 Termination Notice from November 2014 was invalid, and that he intended to protect his rights as a tenant.

126.   In February 2015, one of Rivera's attorneys sent Defendant Mariposa/8th Street Properties, LLC's counsel a reasonable accommodation request based on Rivera's disability, asking that Defendant Mariposa/8th Street Properties, LLC send all notices and letters given to or served on Rivera to his attorneys as well.

127.   On February 23, 2015, Rivera received a notice stating that the manager would no longer accept rent payments at the building and that tenants would be required to mail their rent or drop it off at Defendants' offices in Century City. This change forced Rivera to bear additional costs associated with mailing.

128.   In or around April 2015, Defendant Mariposa/8th Street Properties, LLC increased Rivera's rent. As with Reynolds' rent increase, Rivera's rent increase was illegal because it was neither submitted to nor approved by HACLA.

129.   On June 10, 2015, Rivera received a notice threatening eviction if he did not pay an unauthorized rent increase, $51.75, plus a balance of $3.60 from May 2015, and Housing and Community Investment Department of Los Angeles ("HCIDLA") Systematic Code Enforcement Program ("SCEP") fees of $15.86 from June 2015. Rivera paid the entire amount listed on the notice, $71.21, and was never credited for the unauthorized rent increase. Because it was based upon the unauthorized rent increase, this notice was also illegal.

130.   On July 13, 2015, Rivera received another notice threatening eviction if he did not pay the amount of the unauthorized rent increase, $55.36, plus an SCEP fee of $3.61. Because it was based upon the unauthorized rent increase, this notice was also illegal.

131.   Later in July 2015, Rivera's attorneys sent a second reasonable accommodation request to Defendant Mariposa/8th Street Properties, LLC's counsel asking that Defendant Mariposa/8th Street Properties, LLC send all notices and

1  letters given to or served on Rivera to his social worker at Step Up in addition to his

2  attorneys.

3      132.  In August 2015, Rivera received a notice from Defendant Roxbury

4  stating that Roxbury would be strictly enforcing its late clause fees and requesting

5  that tenants mail in the rent prior to the first of the month.

6      133.  On August 14, 2015, Rivera received a notice threatening eviction if he

7  did not pay the amount of $107.11, comprised of an unauthorized rent increase of

8  $51.75 as well as the remaining unpaid unauthorized rent increase and SCEP fee of

9  $55.36 from July. Because it was based upon the unauthorized rent increase, this

10  notice was also illegal. Rivera filed a complaint with HACLA, after which

11  Defendants rescinded the eviction notice.

12      134.  On September 1, 2015, Rivera's counsel sent a reasonable

13  accommodation request asking that Rivera be permitted to pay his rent on or after he

14  has received his disability benefits on the first of the month, and reiterating his prior

15  reasonable accommodation requests that all notices be sent or copied to his counsel.

16  Defendants never responded to this reasonable accommodation request.

17      135.  In May 2016, despite having paid his rent, Rivera received a notice

18  threatening eviction for nonpayment of rent. Contrary to Rivera's reasonable

19  accommodation requests, Defendants did not provide a copy of this notice either to

20  Rivera's counsel or to Step Up. On May 25, 2016, Rivera's counsel filed a complaint

21  with HCIDLA regarding Rivera's May 2016 eviction notice. Only after Rivera's

22  counsel filed the complaint with HCIDLA did Defendant Roxbury acknowledge that

23  Rivera was current on his rent and that the eviction notice should therefore be

24  disregarded.

25      136.  As a result of Defendants' discriminatory and abusive conduct, Rivera

26  has suffered multiple threats to his ability to remain in his home, which he was able

27  to stave off only through the assistance of Step Up and pro bono counsel, and he has

28  been forced to incur additional costs due to the changes in rent payment terms.

1   Moreover, as a consequence of Defendants' actions, Rivera has experienced

2   significant emotional distress, including anxiety, fear, and loss of sleep.

3       137.   Step Up has had to divert significant time, effort, and expense to helping

4   Rivera combat Defendants' unlawful notices and other discriminatory practices.

5   **IV.   1423 South Magnolia Avenue**

6       138.   From March 13, 2015, until approximately September 2016, Defendant

7   Magnolia Avenue Properties, LLC owned the Magnolia Apartments located at 1423

8   South Magnolia Avenue in Los Angeles (the "Magnolia building"). Built in 1913,

9   the Magnolia building is a three-story, 24-unit structure consisting of 12 studio

10  apartments and 12 one-bedroom apartments. Defendant Magnolia Avenue

11  Properties, LLC paid $2,250,000 for the Magnolia building. Defendant Roxbury

12  provided management services for the Magnolia building on behalf of Defendant

13  Magnolia Avenue Properties, LLC, and Defendant Optimus.

14      139.   After the purchase of the Magnolia building, Defendants[2] immediately

15  set to work increasing the value of the building so that it could be "flipped" for a

16  large profit. Defendants focused their efforts on removing tenants who were

17  working-class, Spanish-speaking Latino families with children.

18      140.   At the Magnolia building, Defendants discriminated against Plaintiffs

19  primarily on the basis of their national origin and familial status, explicitly telling

20  Plaintiffs that they should "learn English," that their children cannot play or make

21  noise in the hallway, and threatening to call immigration. To push out Plaintiffs,

22  Defendants used the following tactics, among others, at the Magnolia building:

23  issuing or threatening to issue baseless eviction notices, threatening to call

24  immigration, reprimanding the Plaintiffs' minor children, and issuing excessive

25  water shutoff notices. As a result, Plaintiffs have suffered emotional distress,

26  _____

27  [2] For purposes of this section regarding the Magnolia building, "Defendants" refers
    to Defendant Optimus, Defendant Roxbury, Defendant Jerome Mickelson, and

28  Defendant Magnolia Avenue Properties, LLC.

1   experienced uninhabitable living conditions, and incurred additional costs to pay

2   their rent. Organizational Plaintiff SAJE has diverted scarce resources to defending

3   against these tactics.

4                              ***SAJE***

5         141.   After Plaintiff Cornelia Martinez attended a tenant clinic run by SAJE

6   in April 2015 and described some of the difficulties she had encountered with

7   Defendants, SAJE began working with tenants at the Magnolia building, including

8   Plaintiffs Cornelia Martinez, Ana Velasquez, Carina Fabian, Hilda Deras, and

9   Carmen Castro.

10        142.   SAJE organizers held a meeting for all tenants of the Magnolia building

11  on April 12, 2015, to advise them of their rights under LARSO and to help them

12  identify legal assistance they could turn to in the face of eviction threats and

13  proceedings.

14        143.   In subsequent meetings with Magnolia building tenants, SAJE

15  organizers learned more about Defendants' abusive conduct towards long-term

16  Spanish-speaking Latino tenants and tenant families with children. SAJE has been

17  forced to divert significant resources to investigating and combatting Defendants'

18  unlawful practices targeting Spanish-speaking Latino families with children,

19  including illegal rent increases, discriminatory rules affecting families with children,

20  and widespread health and safety concerns resulting from the poor condition of the

21  targeted tenants' apartments.

22        144.   For example, in December 2015, SAJE organizers conducted a meeting

23  at the Magnolia building to assist tenants, including Martinez, with completing repair

24  request forms. After those complaints were ignored by Defendants, SAJE organizer

25  Favian Gonzalez filed complaints about the poor conditions on behalf of multiple

26  Magnolia building tenants with the Department of Public Health and HCIDLA.

27  Gonzalez subsequently coordinated the inspections, serving as the primary contact

28  for the inspectors.

145.   On February 1, 2016, Gonzalez received an email from Carmen Correa, who, along with her husband, Damian Correa, worked as Defendants' on-site manager at the Magnolia building. The email informed Gonzalez that there would be fumigations and HCIDLA inspections that week.

146.   On February 3, 2016, Gonzalez went to the Magnolia building to be present for the HCIDLA inspections and to support tenants who were concerned about notices for fumigation. Gonzalez spoke with Ms. Correa about the requirement under California law that reasonable notice of 72 hours must be given prior to fumigations so that tenants can prepare. He also explained to Ms. Correa that some of the tenants, including Plaintiff Ana Velasquez, needed an alternative method to eradicate pests due to their children's asthma. Ms. Correa then became very upset with Gonzalez, told him that he was not allowed on the property, and proceeded to call the police. Gonzalez was on the property with the permission of tenants. The police never came.

147.   Later that day, Gonzalez sent an email to Defendant Mickelson informing him of his interactions with Ms. Correa and explaining why some tenants needed an alternative method for eradicating pests.

148.   Later that same day, Gonzalez received an email from Kamyar Shabani, who stated that he was legal counsel for Defendant Magnolia Avenue Properties, LLC. Shabani threatened that if any tenants refused to allow the pest control company or the on-site manager access to their apartments, Defendant Magnolia Avenue Properties, LLC would take legal action against them and against Gonzalez.

149.   On February 4, 2016, Shabani sent another email to Gonzalez, alleging that Gonzalez had advised the tenants to deny access to their units. Shabani again threatened that if tenants continued to deny access, Defendants would file an "unlawful detainer against each and every tenant" who followed Gonzalez's advice. Gonzalez responded that he had never directed tenants to refuse access to the

property and that he supported the inspections by the county. Gonzalez explained that he wanted to collaborate with the landlord and the management team.

150. On February 4, 2016, Gonzalez received a threatening phone call from Defendant Mickelson stating that Defendant Mickelson intended to go to the SAJE offices and meet with the executive director of SAJE. Gonzalez then emailed Defendant Mickelson to try to set up a time for him to meet with the executive director. Defendant Mickelson never responded.

151. Following this incident, Gonzalez began conducting weekly meetings at the Magnolia building to discuss notices received by the tenants, to advise them of their rights, and to strategize with them on how to defend their rights against Defendants' abusive practices.

152. Commencing in late March 2016, SAJE organizer Delia Ayala took over the weekly Magnolia building meetings. Ayala continued to investigate concerns tenants expressed regarding conditions at the Magnolia building, including water shutoffs, conditions in tenants' apartments, baseless eviction notices, and verbal harassment by managers. Ayala also continued to educate tenants on their rights and assist them in opposing Defendants' unlawful actions.

153. On April 5, 2016, Plaintiff Carina Fabian contacted Ayala asking her to come to the unit because work was being performed and she required assistance communicating with Defendants' maintenance workers.

154. Ayala arrived at the Magnolia building and noticed the low-quality and superficial repairs made by Defendants in units occupied by Fabian and similarly situated tenants. In the unit across the hall from Fabian's unit, the maintenance workers were attempting to replace an old kitchen counter with a dirty counter that was infested with spiders and roaches.

155. Ayala called Defendant Optimus' general property manager, Michael McCain, to explain that this "repair" was unacceptable.

1   156.   On April 6, 2016, Ayala returned to the Magnolia building to continue

2   assisting Fabian and other tenants in their communications with the maintenance

3   workers. The maintenance workers informed Ayala that they were given specific

4   orders by Defendants that if they performed repairs of greater quality than those

5   authorized by Defendants, the maintenance workers would get in trouble.

6   157.   As with Gonzalez, Defendants responded to Ayala's advocacy on behalf

7   of the tenants with belligerence and intimidation.

8   158.   In one incident that took place on May 5, 2016, Ayala accompanied

9   Defendant Mickelson, Mr. and Ms. Correa, and a supervising contractor on a walk-

10   through of the Magnolia building to view completed repairs. Throughout the walk-

11   through, Defendant Mickelson was hostile to Ayala and the tenants. At the end of the

12   walk-through, on seeing some of the tenants' children playing in the halls, Ms.

13   Correa yelled at Ayala, telling her that she should tell the tenants to control their

14   children.

15   159.   When Ayala returned to the Magnolia building on May 19, 2016 for

16   HCIDLA inspections, Defendant Mickelson informed her, in apparent retaliation for

17   Ayala's advocacy on behalf of tenants, that if any of the tenants were not present she

18   could not enter their units regardless of whether the tenants had given her permission

19   to enter.

20   160.   Another incident occurred after Plaintiffs Velasquez, Fabian, and Castro

21   approached Ms. Correa about notices they had received threatening eviction based

22   on their children's playing in the hallways in July 2016, which is fully described

23   below. Ms. Correa became angry and threatened to call immigration, social services,

24   and the police on all of them.

25   161.   Velasquez and other tenants notified Ayala of this threatening

26   interaction; Ayala emailed Defendant Mickelson about Ms. Correa's unacceptable

27   conduct. After Ms. Correa denied the accusations, Defendant Mickelson responded

28   by threatening Ayala. He told her, "Get the tenants under control or we will take

1  action," and warned that Defendants would take the matter to court "if the damage

2  and disruption doesn't stop."

3  ### *Cornelia Martinez*

4  162.   Plaintiff Cornelia Martinez is a long-term tenant of the Magnolia

5  building. Martinez is a Spanish-speaking Latina woman who lives with her two

6  children and her husband.

7  163.   As detailed below, during the time that Defendants owned and managed

8  the Magnolia building, Martinez was subjected to many of their discriminatory and

9  abusive practices. At Defendants' hands, Martinez experienced unlawful threats of

10  eviction, inadequate provision of maintenance services, derogatory and harassing

11  statements on the basis of her national origin, a policy restricting her children's right

12  to use of the common areas, an illegal rent increase, and burdensome and

13  discriminatory changes to Defendants' rent payment policies. Defendants also

14  retaliated against Martinez for her organizing activities and requests for repairs.

15  164.   Due to Defendants' failure to provide adequate repairs, Martinez and

16  her family lived with a broken heater, plumbing issues, leaks, broken windows and

17  peeling paint. Meanwhile, Defendants renovated and improved empty units in the

18  building.

19  165.   On April 1, 2015, Martinez submitted a request for repairs to the on-site

20  manager regarding the heater, plumbing problems, broken windows, and peeling

21  paint.

22  166.   On April 2, 2015, after learning that Defendant Magnolia Avenue

23  Properties, LLC was going to remove the screen doors from all of the units, Martinez

24  created a petition asking them not to remove the screen doors. Many tenants of the

25  Magnolia building signed the petition. The tenants wanted to keep the screen doors

26  because during the summer the units, which lack air conditioning, get very hot and

27  the screen doors enabled tenants to leave the doors to their units open to provide

28

1  cross-ventilation. Defendants ignored the petition and all of the screen doors were

2  removed.

3      167.   In retaliation for her request for repairs and organizing activities,

4  Defendant Magnolia Avenue Properties, LLC sent Martinez an eviction notice

5  demanding payment of April's rent. The notice was dated April 2, 2015, even though

6  Defendants had regularly accepted Martinez's rent during the first week of the

7  month.

8      168.   Martinez asked the on-site manager at the time, known only as Andrea,

9  about the notice, and Andrea told Martinez that Defendants would eventually get rid

10  of all the tenants.

11      169.   Martinez attempted to pay rent on April 7, 2015, but Defendants refused

12  to accept it.

13      170.   Defendant Magnolia Avenue Properties, LLC filed an unlawful detainer

14  action against Martinez on April 9, 2015.

15      171.   That same day, Martinez attended the tenant clinic run by SAJE to seek

16  advice. Between May and June 2015, Martinez was in continuous contact with

17  organizers from SAJE regarding her unlawful detainer action and problems with her

18  unit.

19      172.   The unlawful detainer action against Martinez was dismissed on June

20  25, 2015, when Martinez's counsel filed and argued a motion for summary judgment

21  and counsel for Defendants failed to appear.

22      173.   In April 2015, Andrea made discriminatory and derogatory remarks to

23  Martinez. In one incident, Martinez was cooking Mexican food and Andrea went to

24  Martinez's apartment to tell her that her food smelled disgusting and foul. On

25  another occasion, Martinez asked Andrea to post notices in Spanish so she could

26  understand them. Andrea refused to do so, telling Martinez that she was in America

27  so she should learn to speak English.

28

174.   In June 2015, Martinez was standing in her hallway talking to her neighbor while her daughters were playing in the hall. Andrea walked by and told Martinez that her daughters could not play in the hallway.

175.   On June 24, 2015, SAJE organizers filed habitability complaints with the Department of Public Health on behalf of Martinez and other tenants in the building. The complaints were addressed with superficial repairs and Martinez continued to have habitability issues.

176.   Beginning on October 1, 2015, Defendants eliminated the option of paying rent via the on-site drop box and directly to the manager and instead began requiring Martinez and other Magnolia building tenants to pay rent to their offices in Century City—miles away from the apartment building ("October 2015 Rent Payment Terms"). As a result of this change, Martinez had to purchase money orders and certificates of mailing from the post office to prove that she had actually mailed her rent on time.

177.   On December 1, 2015, Martinez and other tenants received a 30-day notice that their rent would be increased. Martinez was given notice that her rent would increase by 4%, an amount above the legally permitted increase of 3% for Martinez's unit.

178.   Martinez's counsel submitted a complaint to HCIDLA and the illegal increase was eventually rescinded in March 2016.

179.   Despite the complaints to management and the Department of Public Health, in December 2015 Martinez continued to suffer severe problems with her unit, including infestations of rodents, roaches, and bedbugs. Martinez told Andrea about the pests plaguing her home, but, again, she was ignored by the Defendants.

180.   On December 16, 2015, SAJE organizers conducted a meeting at the Magnolia building to assist Martinez and other tenants in completing repair request forms and to learn more about the issues the tenants were facing.

181.   On January 5, 2016, after Defendants ignored the complaints, Martinez's counsel filed complaints with the Department of Public Health and HCIDLA.

182.   On January 14, 2016, in retaliation for Martinez's complaints to Defendants and to the Department of Public Health and HCIDLA, Defendant Magnolia Avenue Properties, LLC issued Martinez an eviction notice alleging that she was delinquent in rent, despite the fact that Martinez had paid her rent ten days earlier.

183.   On January 28, 2016, Martinez's counsel submitted a HCIDLA complaint on Martinez's behalf, charging that the rent increase was illegal.

184.   The February 2016 inspections by the Department of Public Health uncovered violations in Martinez's unit, including cockroaches in multiple life stages and rodent feces.

185.   During the spring of 2016, to appease the Department of Public Health and HCIDLA, Defendants made superficial and inadequate "repairs" to Martinez's unit.

186.   On February 4, 2016, Defendants retaliated against Martinez for her complaints by issuing another eviction notice alleging she was delinquent in rent, even though she had already paid her rent.

187.   On February 22, 2016, Martinez and other Magnolia building tenants received a notice from Defendant Magnolia Avenue Properties, LLC stating that an online property management system would be implemented by April 1, 2016, and would enable tenants to pay their rent online with a debit or credit card, review their ledger and submit maintenance requests. This notice requested that tenants provide their email addresses to the on-site manager.

188.   Martinez and the other low-income Spanish-speaking Latino tenants of the Magnolia building were unable to take advantage of this new system because

1  most of them did not have internet access, computers, email addresses, bank
2  accounts, or credit cards.

3      189.   This online property management system excluded Martinez and
4  similarly situated tenants and catered to the new, younger, English-speaking tenants
5  who were moving into the Magnolia building's renovated units.

6      190.   In March 2016, after receiving eviction notices in January and February
7  alleging that they were delinquent on rent payments they had, in fact, mailed,
8  Martinez and Plaintiff Ana Velasquez decided to start personally delivering their rent
9  to Defendants' office in Century City, which was approximately a ten-mile trip from
10 the Magnolia building.

11     191.   Other Magnolia building tenants joined Martinez and Velasquez in
12 bringing their rent payments to Defendants' office in Century City.

13     192.   On April 15, 2016, Martinez was served with yet another baseless
14 eviction notice alleging that she was delinquent in rent. The April 15 eviction notice
15 was signed by Michael McCain, Optimus' general property manager, despite the fact
16 that, two weeks earlier, on April 1, 2016, McCain himself had signed and delivered
17 Martinez a receipt for the rent she paid that day.

18     193.   Martinez informed SAJE organizer Ayala about this notice.

19     194.   Other tenants of the Magnolia building, including Plaintiffs Fabian and
20 Velasquez, received similar notices during the same period.

21     195.   On April 18, 2016, Ayala wrote McCain and Ms. Correa, explaining
22 that the tenants were not delinquent in rent and asking what charges the eviction
23 notices were based on. Ayala never received a response and the notices were never
24 rescinded.

25     196.   Between February and May 2016, Martinez and other Magnolia
26 building tenants received at least ten notices stating that water would be shut off,
27 representing over fifty hours without access to water. Water was shut off for multiple
28 days in March 2016.

197.   Martinez and other Magnolia building tenants who received these notices informed Ayala of the inconvenience of the water shutoffs.

198.   Several of the tenants complained to Ms. Correa, but she did not respond.

199.   On July 15, 2016, a notice, signed "Management," was posted on Martinez's door about her child playing in the hallway. The notice threatened that Martinez would be evicted if her children continued playing in the hallway.

200.   Martinez suffered significant injury as a result of Defendants' discriminatory and abusive conduct. She and her family were forced to endure substandard and unhealthy living conditions for months on end. She experienced significant emotional distress as a result of Defendants' many baseless threats of eviction, the harassing and humiliating comments directed at her by Defendants' employee, and the burdensome and discriminatory rules imposed by Defendants.

201.   SAJE had to divert substantial resources, including significant amounts of staff time, to address Defendants' discriminatory and unlawful treatment of Martinez.

### _Ana Velasquez_

202.   Plaintiff Ana Velasquez has been a tenant of the Magnolia building since December 2010. Velasquez is a Spanish-speaking Latina woman who lives with her husband and two minor children.

203.   Like Martinez, Velasquez experienced many of Defendants' discriminatory and abusive practices during the time Defendants owned and managed the Magnolia building. As described below, Velasquez experienced unlawful threats of eviction, inadequate provision of maintenance services, derogatory and harassing statements on the basis of her national origin, a policy restricting her children's right to use of the common areas, an illegal rent increase, burdensome and discriminatory changes to Defendants' rent payment policies, and retaliatory threats and intimidation.

204.   In April 2015, Velasquez was watching her daughter and other children play in the hallway outside her apartment. The on-site manager, Andrea, approached Velasquez and told her that her children were not allowed to play in the hallways.

205.   Later that month, Velasquez received a notice in English from Defendant Magnolia Avenue Properties, LLC posted on her door.

206.   Velasquez did not understand the notice because it was in English and asked Andrea, the manager, to translate it for her. Andrea refused, stating that Velasquez should learn English because she was in America.

207.   After Defendants instituted the October 2015 Rent Payment Terms eliminating the on-site payment options, Velasquez faced additional costs and burdens in paying her rent. Velasquez was forced to bear the expenses of certified mailings and payment of her rent days in advance, or personally delivering the rent to Defendants' offices in Century City.

208.   In December 2015, Velasquez received a 30-day notice that her rent would increase by 4%, an amount above the legally permitted increase of 3% for her unit.

209.   Velasquez's counsel submitted a complaint to HCIDLA and the illegal increase was eventually rescinded in March 2016.

210.   In January 2016, Velasquez's counsel submitted a HCIDLA complaint regarding habitability issues in Velasquez's unit, including a clogged bathtub, holes in the walls, and an open electrical socket.

211.   Later that month, SAJE sent a request for repairs to Defendants on Velasquez's behalf. The request was ignored.

212.   In February 2016, with SAJE's assistance, Velasquez requested that Defendants use a different pest removal procedure rather than fumigation as a reasonable accommodation for her child's asthma. Defendants subsequently denied her requested pest removal procedure, but agreed to provide additional notice prior to fumigating.

213.   Shortly thereafter, Defendant Magnolia Avenue Properties, LLC retaliated against Velasquez for her complaints, requests for repairs, and request for reasonable accommodation by issuing a baseless eviction notice alleging that she was delinquent in her rent, despite the fact that she had already paid.

214.   Defendant Magnolia Avenue Properties, LLC never instituted unlawful detainer proceedings on the basis of the eviction notice.

215.   Following the February 2016 eviction notice, Velasquez, along with Martinez, decided that it was more reliable to personally deliver their rent payments each month to Defendants' Century City office. Velasquez began personally delivering hers and Martinez's rent payments in March 2016, taking buses to travel ten miles to Defendants' office. This trek took Velasquez over an hour each way.

216.   Velasquez did not have the ability to access the online rent payment system that Defendants made available beginning in April 2016.

217.   In mid-April 2016, Velasquez received another baseless eviction notice falsely alleging that she was delinquent in her rent.

218.   Velasquez informed Ayala of this notice. As described above, Ayala wrote McCain and Ms. Correa on April 18, 2016, to explain that Velasquez and other tenants were not delinquent in rent. Ayala never received a response and the notices were never rescinded.

219.   Between February and May 2016, Velasquez and other Magnolia building tenants received at least ten notices stating that water would be shut off, representing over fifty hours without access to water. Water was shut off for multiple days in March 2016.

220.   On July 15, 2016, Defendant Magnolia Avenue Properties, LLC posted a notice on Velasquez's door regarding her child playing in the hallway. The notice threatened that she would receive an eviction notice if her children continued to play in the hallway.

221.   On July 18, 2016, a second notice was posted on Velasquez's door threatening that she would receive an eviction notice if her children continued running and playing in the hallways. Plaintiffs Carina Fabian and Carmen Castro, and another tenant named Gloria Morales, received the same notice.

222.   Following receipt of the July 18th notice, Velasquez, along with Fabian, Castro, and Morales, went to Mr. and Ms. Correa's apartment to inquire about the notices. Ms. Correa stated that she was under pressure from Defendants in the Century City office to resolve complaints about the children made by new tenants. Throughout the conversation, Ms. Correa became increasingly upset at Velasquez and the other tenants and threatened to call immigration, social services and the police on all of them.

223.   In early August 2016, Velasquez received another notice from Defendant Magnolia Avenue Properties, LLC posted on her door, about children playing in the hallway. This notice similarly threatened an eviction if the children continued their activities in the hallways.

224.   Velasquez suffered significant injury as a result of Defendants' discriminatory and abusive conduct. She and her family were forced to endure substandard and unhealthy living conditions. She experienced significant emotional distress as a result of Defendants' baseless threats of eviction, the harassing and humiliating comments directed at her by Defendants' employee, and the burdensome and discriminatory rules imposed by Defendants.

225.   SAJE had to divert substantial resources, including significant amounts of staff time, to address Defendants' discriminatory and unlawful treatment of Velasquez.

### *Carina Fabian*

226.   Plaintiff Carina Fabian has been a Magnolia building tenant since 2010. Fabian is a Spanish-speaking Latina woman who lives with her child, her husband, and her brother-in-law.

227.   Like other Spanish-speaking Latino tenants and tenant families with children at the Magnolia building, Fabian experienced many of Defendants' discriminatory and abusive practices during the time Defendants owned and managed the Magnolia building. As detailed below, Velasquez experienced unlawful threats of eviction, inadequate provision of maintenance services, intimidating statements and threats from Defendants' employees, a policy restricting her child's right to use of the common areas, an illegal rent increase, and burdensome and discriminatory changes to Defendants' rent payment policies.

228.   While they owned the property, Defendants failed to provide adequate repairs in Fabian's unit. Fabian's home became infested with pests, the pipes and drains began leaking, and the paint and drywall began to peel from lack of upkeep. Fabian complained to Defendants about the poor condition of her apartment and, with help from her attorneys, filed complaints with the Department of Public Health and HCIDLA. However, despite improving the building and units of other, newer tenants, Defendants neither updated nor adequately repaired Fabian's apartment.

229.   As a result of the October 2015 Rent Payment Terms, by which Defendants stopped accepting rent on site, Fabian had to bear the expenses of certified mailing and pay her rent days in advance, or personally deliver the rent to Defendants' office.

230.   In December 2015, Fabian received a 30-day notice that her rent would increase by 4%, an amount above the legally permitted increase of 3% for her unit.

231.   Fabian informed SAJE organizers about this increase.

232.   Fabian's counsel submitted a complaint to HCIDLA and the illegal increase was eventually rescinded in March 2016.

233.   On January 14, 2016, the on-site manager at the time, Andrea, handed Fabian a move out stipulation agreement. Andrea told Fabian that if she signed the document she would have until April 30, 2016, to move out of the unit. Fabian refused to sign the document.

234.   Later that same day, Fabian received a baseless eviction notice alleging that she was delinquent in rent for the month of January, even though Fabian had already paid her January rent.

235.   On January 20, 2016, Fabian sent a letter to Defendant Magnolia Avenue Properties, LLC explaining that she had paid her rent as required and expressing her belief that the eviction notice was issued in retaliation for her complaints regarding the building's condition and her desire to remain in her home.

236.   In January 2016, on Fabian's behalf, SAJE made a request for repairs to Defendants. This request concerned a leaking bathroom showerhead, peeling paint, roach infestation, and a warped floor.

237.   On January 21, 2016, Fabian's counsel submitted complaints to the Department of Public Health and HCIDLA regarding her leaking bathroom showerhead, peeling paint, roach infestation, and warped floor.

238.   In the middle of February 2016, Fabian was supervising her son and other children who were playing in the hallway. When Ms. Correa saw the children playing, she confronted Fabian and told her that children were not allowed to play in the hallways.

239.   On February 23, 2016, HCIDLA issued a Notice and Order to Comply to Defendant Magnolia Avenue Properties, LLC, citing habitability issues in Fabian's unit.

240.   The Order to Comply also cited an "unapproved unit" in Fabian's apartment because a wall in the unit was built without proper authorization. It also stated that, to comply, Defendant Magnolia Avenue Properties, LLC would have to remove the wall.

241.   On April 1, 2016, with the assistance of SAJE organizer Ayala, Fabian drafted another repair form that she submitted to the on-site manager; the repair form concerned holes around the kitchen sink counter, leaks from the bathroom and kitchen sinks, mold on the bathroom ceiling, defective plumbing in the bathroom,

1    peeling paint in the bathroom and hallway, defective electricity in the kitchen,

2    broken windows in the bedroom and hallway, defective lock in the bathroom, roach

3    infestation in the kitchen, and defective smoke detectors.

4        242.   On April 4, 2016, HCIDLA inspected Fabian's unit, Martinez's unit,

5    and units of other Magnolia building tenants.

6        243.   Ayala was present for these inspections, and the inspector informed

7    Ayala that the Magnolia building continued to have violations. One of the violations

8    included the unauthorized wall in Fabian's unit.

9        244.   On March 2, 2016, Fabian received an eviction notice alleging that

10    another person living in her unit drank alcohol and urinated on the fire escape. In

11    April 2016, in retaliation for her complaints regarding her unit, Defendant Magnolia

12    Avenue Properties, LLC filed an unlawful detainer action against Fabian based upon

13    the March eviction notice.

14        245.   Fabian called Ayala for assistance, and, on April 11, 2016, Ayala went

15    to Fabian's unit to go over the documents Fabian had received.

16        246.   Around April 14, 2016, Fabian spoke with Defendant Mickelson, as

17    well as with Mr. and Ms. Correa about the unlawful detainer action. Defendant

18    Mickelson was very aggressive towards Fabian and told her that even if she won in

19    court, they would make sure she left the apartment by other means.

20        247.   Fabian was very upset about this interaction and called Ayala to report

21    what happened.

22        248.   Defendant Magnolia Avenue Properties, LLC eventually withdrew the

23    unlawful detainer action against Fabian after producing video footage of the alleged

24    violation in discovery. Fabian did not know the person in the video.

25        249.   On July 18, 2016, Defendant Magnolia Avenue Properties, LLC posted

26    a notice on Fabian's door regarding her son playing in the hallway. The notice

27    threatened Fabian with an eviction if her son continued to play in the hallway.

28

250. Shortly after receiving the notice, Fabian went with Plaintiffs Velasquez and Castro, as well as with fellow tenant Gloria Morales, to Mr. and Ms. Correa's apartment to ask about the notice. As described above, Ms. Correa threatened to call immigration, social services, and the police on Fabian and the other tenants.

251. Fabian informed Ayala of this notice and of the incident with Ms. Correa.

252. As with Martinez and Velasquez, Fabian also received numerous notices stating that water would be shut off. Water was shut off for multiple days in March 2016.

253. Fabian suffered significant injury as a result of Defendants' discriminatory and abusive conduct. She and her family were forced to endure substandard and unhealthy living conditions. She experienced significant emotional distress as a result of Defendants' efforts to pressure her to leave, the threatening and intimidating comments directed at her by Defendants' employees, and the burdensome and discriminatory rules imposed by Defendants.

254. SAJE had to divert substantial resources, including significant amounts of staff time, to address Defendants' harassment of Fabian.

### *Hilda Deras*

255. Plaintiff Hilda Deras moved into her apartment in the Magnolia building in September 1977. Deras is a Spanish-speaking Latina woman.

256. During the period that Defendants owned and managed the Magnolia building, Deras experienced many of Defendants' discriminatory and abusive practices, including the inadequate provision of maintenance and repairs to her unit, a baseless and retaliatory attempt to evict her from her home of many years, and the burdensome rules imposed by Defendants.

257. Throughout her almost forty-year tenancy, Deras has witnessed the Magnolia building change ownership many times. Following Defendants' acquisition

1   of the property, the harassment, intimidation, and hardships she experienced in her

2   home of decades notably increased.

3       258.   The October 2015 Rent Payment Terms, which eliminated on-site

4   options for paying rent, created unnecessary hardship for Deras. Because Deras feels

5   more secure if her rent is delivered to the office in person, she had to rely on an

6   arrangement with a neighbor who physically took Deras' rent to Defendants'

7   Century City office.

8       259.   The online payment system Defendants instituted in April 2016

9   excluded Deras from participating in the payment platform, as she does not have

10   access to a computer, internet, or email. Instead, the online system caters to the new,

11   younger, English-speaking tenants.

12       260.   In December 2015, Defendant increased Deras' rent to an amount above

13   the legally permitted increase. Deras and other tenants informed Ayala of this illegal

14   increase. Deras' counsel filed a complaint with HACLA and the increase was

15   eventually rescinded in March 2016.

16       261.   Between March and May 2016, Deras received at least eight notices

17   about water shutoffs, which totaled over fifty hours without water. Water was shut

18   off for multiple days in March 2016.

19       262.   Between February and June 2016, Deras received at least twenty notices

20   from Defendants' management demanding access to her unit. The reasons given for

21   the majority of these notices were fumigation and repairs, but during the same period

22   between early to mid-2016, Defendants failed to address many outstanding problems

23   in Deras' unit.

24       263.   For example, Deras' carpet is old, dilapidated, and has holes. The

25   building management has not replaced the carpet in over twenty years. She had leaks

26   in her bathroom sink. She had a rodent infestation. With the help of Ayala from

27   SAJE, Deras submitted a written complaint to Ms. Correa about many of these issues

28   on April 6, 2016.

264.   On April 15, 2016, less than two weeks after complaining about the problems in her unit, Deras received two different groundless eviction notices.

265.   The first was an eviction notice demanding payment of April 2016 rent, even though Deras had paid her April 2016 rent in full.

266.   The second eviction notice stated that she was required to get rid of her pets or vacate the premises. Deras has had various pets throughout her almost forty year tenancy. She has always had approval to have her pets and has never had an issue with having pets. Additionally, Defendants were well aware of Deras' pets due to their frequent inspections of her unit and the fact that she would walk her dog twice a day. Until Deras complained about the issues in her unit, Defendants had never said anything about her pets. Furthermore, others in the building, including on-site managers Mr. and Ms. Correa, had pets.

267.   Deras notified Ayala about the notice and Ayala wrote to McCain on April 18, 2016, explaining that Deras has had pets for many years. Neither Ayala nor Deras received any response from Defendants.

268.   On May 10, 2016, in retaliation for her complaints about her unit, Defendant Magnolia Avenue Properties, LLC filed an unlawful detainer action against Deras. After Deras' counsel moved for summary judgment, Defendants dismissed their case. But for the legal assistance she received, Defendants' meritless legal action would likely have terminated Deras' decades-long tenancy.

269.   Defendants' discriminatory and abusive conduct towards Deras caused her great anxiety and has cost her financially and emotionally. She experienced substandard living conditions and endured the fear of homelessness due to Defendants' efforts to evict her. Additionally, she was forced to spend time and money to ensure that her rent was accepted by Defendants and to fight the baseless eviction proceedings.

270.   SAJE had to divert substantial resources, including staff time, to address Defendants' unlawful and discriminatory treatment of Deras.

1

### *Carmen Castro*

2      271.   Plaintiff Carmen Castro has lived in the Magnolia building with her

3  family since 2011. Castro is a Spanish-speaking Latina woman and lives with her

4  husband and two minor children.

5      272.   During the period that Defendants owned and managed the Magnolia

6  building, Castro experienced many of the same discriminatory and unlawful

7  practices as other Latino tenants and tenant families with children in the building,

8  including legally baseless eviction threats, an illegal rent increase, burdensome and

9  discriminatory rules, and threatening and intimidating statements from the building

10  manager.

11      273.   Like other long-term Magnolia building tenants, after the

12  implementation of the October 2015 Rent Payment Terms, by which Defendants

13  stopped accepting rent on site, Castro had to bear the expenses of mailing and paying

14  her rent days in advance, or personally delivering the rent to the Defendants' office.

15      274.   In December 2015, similar to other Magnolia building tenants, Castro

16  received a 30-day notice that her rent would increase by 4%, an amount above the

17  legally permitted increase for her unit. The illegal increase was eventually reversed

18  in March 2016.

19      275.   Castro also suffered due to Defendants' continual harassment and

20  discrimination against her and her children during the period that Defendants owned

21  and managed the Magnolia building.

22      276.   Around March or April 2015, shortly after Defendants acquired the

23  property, Castro was watching her children play in the hallway. She was approached

24  by the resident manager at the time, Andrea, who told her that children were not

25  allowed to play in the hallways.

26      277.   In December 2015, Castro was preparing to take her children to the park

27  and one of her children was waiting for her in the hallway with his scooter. Andrea

28

1  again confronted Castro and told her that children were not allowed to play in the
2  hallways.

3      278.   Between February and May 2016, Castro, along with other Magnolia
4  building tenants, received at least ten notices stating that water would be shut off,
5  representing over fifty hours without access to water. Water was shut off for multiple
6  days in March 2016.

7      279.   Sometime in late February or early March 2016, Castro was preparing
8  dinner in her unit and had her front door open. She could hear her children in the
9  hallway talking in normal voices. She then heard someone yell at them to be quiet.
10 Her children ran back into the apartment and she learned that Mr. Correa told them
11 to be quiet.

12     280.   In mid-March 2016, Castro's older child was sitting on the stairs with a
13 neighbor's child quietly playing games on a cell phone. Ms. Correa approached both
14 the children and accused them of obstructing the stairs and told them that they were
15 not allowed to play there.

16     281.   In May 2016, Castro's oldest child was taking out the trash. He set the
17 trash bag down on the floor momentarily while texting or chatting with a friend. Ms.
18 Correa then told Castro that she had seen video footage of her child leaving a trash
19 bag on the floor and that the next time it happened there would be consequences.
20 Castro took this to mean that her family would be evicted.

21     282.   In June 2016, one of Castro's children was playing on the first floor
22 with the child of a neighbor. While he was playing, Ms. Correa scolded him and said
23 that he did not listen and that he could not play in the hallways.

24     283.   On July 8, 2016, Castro received an eviction notice demanding payment
25 of rent, even though Castro had already paid her rent for the month.

26     284.   In the afternoon of July 15, 2016, Castro was watching her younger
27 child play tic-tac-toe in the hallway with a neighbor's child. Later that evening,
28 Castro found a notice from Defendants' management posted on her door regarding

1  her children's play in the hallway and threatening that if this activity continued she
2  would be served with a three-day eviction notice.

3  285.   On July 18, 2016, Castro's child was playing in the hallways with a
4  neighbor's child. Later that evening, Castro received another notice posted on her
5  door, threatening that Castro would be served an eviction notice if her children
6  continued to play in the hallway.

7  286.   As described above, when Castro, Velasquez, Fabian, and Morales
8  approached Ms. Correa about the notices, she threatened that she would call
9  immigration, social services and the police on the four women.

10  287.   On July 28, 2016, Castro received yet another notice from Defendants'
11  management stating that her children were playing soccer on July 26 and 27, 2016,
12  and that if they continued this activity, she would be served with an eviction notice.

13  288.   On August 3, 2016, Castro received a fourth notice about her children
14  playing in the hallway that threatened eviction.

15  289.   On August 11, 2016, one of Castro's children was sitting in front of a
16  friend's apartment playing games on a cell phone. Mr. Correa approached the
17  children and told them to "shh" and to lower the volume on the phone.

18  290.   Defendants' discriminatory and abusive treatment of Castro caused her
19  financial and emotional injury. Castro was forced to incur additional costs to comply
20  with the October 2015 Rent Payment Terms. Further, the constant harassment of
21  Castro and her children, as well as the threats of eviction, greatly worried Castro and
22  caused her and her family stress and anxiety.

23  291.   SAJE had to divert substantial resources, including staff time, to address
24  Defendants' unlawful and discriminatory treatment of Castro.

25  **V.   756 South Normandie Avenue**

26  292.   From May 8, 2014, until approximately November 1, 2016, Defendant
27  South Normandie Properties, LLC owned the South Normandie Apartments located
28  at 756 South Normandie Avenue in Los Angeles (the "756 Normandie building").

Built in 1925, the 756 Normandie building is a three-story, 30-unit structure consisting of 24 studio apartments and six one-bedroom apartments. Defendant Roxbury provides management services for the 756 Normandie building on behalf of Defendant South Normandie Properties, LLC, and Defendant Optimus.

293.   After their purchase of the 756 Normandie building, Defendants[3] immediately set to work on increasing the value of the building so that they could flip it for a large profit. In this building, Defendants focused their efforts on removing working-class, Spanish-speaking Latinos, including families with children.

294.   At the 756 Normandie building, Defendants discriminated against Plaintiffs primarily on the basis of their national origin and familial status, explicitly telling Plaintiffs that they must show American photo identification when they are locked out of their apartments and that they could not tell the difference between Plaintiffs Ramos and Gregorio. To push out Plaintiffs, Defendants used the following tactics, among others, at the 756 Normandie building: issuing baseless eviction notices, delaying, refusing, or making shoddy repairs, and attempting to levy illegal rent increases. As a result, Plaintiffs have suffered from uninhabitable living conditions and emotional distress and have incurred additional costs to pay their rent.

### ***Nicolas Gregorio***

295.   Plaintiff Nicolas Gregorio has been a tenant of the 756 Normandie building since January 2005. Gregorio is a Spanish-speaking Latino man.

296.   During the time that Defendants owned and managed the 756 Normandie building from 2014 to 2016, Gregorio was subjected to Defendants' failure to provide needed maintenance and repairs as well as harassing and degrading treatment by Defendants' employees.

---

[3] For purposes of this section regarding the 756 Normandie building, "Defendants" refers to Defendant Optimus, Defendant Roxbury, Defendant Mickelson, and Defendant South Normandie Properties, LLC.

297.   Gregorio's unit suffers from leaks in the kitchen, leaks in the bathroom ceiling, a broken freezer, holes in the carpeting, bedbugs, holes in the walls, rodents, and cockroaches.

298.   From November 2015 to the time that Defendants sold the 756 Normandie building, Gregorio submitted numerous requests for repairs to Defendants.

299.   Defendants either ignored Gregorio's requests or responded with poor quality and superficial partial repairs that have not fixed the conditions complained of. In many instances, Defendants unreasonably delayed repairs or service.

300.   For example, Defendants did not respond to Gregorio's request to repair a broken sink for three weeks. The work, when it was finally completed, was poorly done, and the sink soon stopped working again.

301.   In 2015, Defendants finally fumigated Gregorio's unit, after many requests for service to address the bedbug and cockroach infestation. The fumigation did not stem the bedbug or cockroach infestation.

302.   Sometime around November 2015, a maintenance worker was at Gregorio's unit with Gregorio when a Latino couple interested in renting an apartment was walking through the building. The maintenance worker told Gregorio that the couple was wasting their time because the owners do not want to rent to Latinos.

303.   Throughout 2015 and 2016, while Defendants were ignoring Gregorio's requests for repairs or addressing them with poor quality and superficial remedies, Defendants were conducting significant renovations and improvements to the recently vacated units in the 756 Normandie building.

304.   On June 18, 2016, Gregorio's counsel filed complaints with the Department of Public Health and HCIDLA regarding the failure of Defendant South Normandie Properties, LLC, to properly perform the repairs in Gregorio's unit.

305.   In or around July 2016, a maintenance worker changed the locks on Gregorio's front door. Gregorio, who was in his apartment at the time, was informed by the maintenance worker that she would get him the new key from on-site manager Brian Hart. The worker returned a few minutes later without the key and told Gregorio that he needed to speak to Hart himself. Gregorio went with the worker to knock on Hart's door but Hart did not respond. About ten minutes later, after the worker left the building, Gregorio knocked on Hart's door again. Finally, Hart answered and told Gregorio that he needed his identification before he would give him the key. Hart explained that he needed identification because he could not tell the difference between Gregorio and Plaintiff Ramos.

306.   Following Hart's comment, Gregorio returned to his apartment to get his identification. On his way, Gregorio saw Plaintiff Ramos and his daughter. He told Ramos about the problem and all three of them returned to Hart's door with Gregorio's identification. Hart refused to open his door. Gregorio then called Defendants' office in Century City and spoke with manager McCain. McCain told Gregorio that Hart would not open his door because he was with Ramos and his daughter. Then McCain stated that Hart was calling the police and that when the police came he would leave the key with them.

307.   The police arrived a short while later and asked Gregorio whether he lived in the unit and to see his identification. Gregorio gave the police his identification and a rental document with his name to prove he lived in the unit. The police and Gregorio then went to get the key from Hart. Hart still refused to give them the key and instead called the Century City office. Finally, after speaking with the Century City office, Hart gave Gregorio his key. This incident took place over the course of about five hours.

308.   On July 11, 2016, HCIDLA inspected Gregorio's unit and found multiple violations in the unit.

309.   Sometime in July 2016, after the inspection took place, Defendant Mickelson went to Gregorio's unit to find out why he had filed complaints with the housing and health departments. Defendant Mickelson demanded Gregorio's identification, and when Gregorio only produced Mexican identification, Defendant Mickelson told him that it was unacceptable.

310.   Gregorio suffered significant injury due to Defendants' unlawful and discriminatory conduct, including substandard and unhealthy living conditions, humiliating treatment at the hands of Defendants' employees, and emotional distress.

### *Pedro Ramos*

311.   Plaintiff Pedro Ramos has been a tenant of the 756 Normandie building since at least 1997. Ramos is a Spanish-speaking Latino man who lives with his wife and two children.

312.   During the time that Defendants owned and managed the 756 Normandie building from 2014 to 2016, Ramos was subjected to Defendants' failure to provide needed maintenance and repairs, an illegal rent increase, and an unwarranted attempt to evict Ramos after he attempted to pay his rent.

313.   Since 2015, Ramos' unit has had leaks in the bathtub, a broken window, holes in the walls, broken kitchen appliances, peeling and cracked paint, and infestations of bedbugs, cockroach, and rodents.

314.   Ramos and his children have suffered poor health and bite marks from bedbugs and roaches.

315.   Ramos' nephew, a toddler, impaled his foot on a nail protruding from the carpet.

316.   Since April 2015 and up to the time that Defendants sold the 756 Normandie building, Ramos made numerous written and oral requests to Defendants for repairs and fumigation.

317.   Defendants either ignored Ramos' requests or responded with poor quality and superficial partial repairs that have not fixed the problems.

318.   Defendants  failed to properly fumigate Ramos' unit to eradicate the bedbug and cockroach infestation.

319.   Defendants never refurbished Ramos' appliances or paint. However, Defendants renovated and improved empty units in the 756 Normandie building for rental to the types of tenants they preferred.

320.   On August 14, 2015, Defendant Roxbury posted a notice that, beginning September 1, 2015, it would "be strictly enforcing the late fees clause" in leases.

321.   Prior to this, it was the longstanding practice in the 756 Normandie building for rent to be accepted within a brief grace period after the due date.

322.   On October 1, 2015, Defendant South Normandie Properties, LLC posted a 30-day notice that it would increase Ramos' rent by 4%, an increase in excess of the legally allowable limit.

323.   On October 2, 2015, Ramos received a notice to pay rent or quit the premises. Ramos had withheld his rent because of his overwhelming habitability issues.

324.   Ramos attempted to pay his October 2015 rent on October 12, 2015, but Defendants refused to accept it.

325.   On October 13, 2015, Defendant South Normandie Properties, LLC initiated an unlawful detainer action against Ramos based on his purportedly late payment of rent. Defendants later withdrew the action.

326.   On October 22, 2015, a Department of Public Health inspection of Ramos' unit revealed a cockroach infestation, bedbugs, deteriorated cabinets, a hole in the wall, peeling ceiling paint, an inoperable bathtub, and mold on the ceiling.

327.   Despite the inspection and Ramos' numerous complaints, the poor living conditions in Ramos' unit persist to this day.

328.   Around January 2016, a lock with a key code was added to the front gate so tenants could enter the building with a code and without a key. When Ramos' daughter requested the key code, the on-site manager at the time, Amelia Squires,

told her that she could not give her the code because "they"—which Ramos took to mean Latino tenants—let in too many people. Ramos was aware that Squires refused to give other Latino tenants the code, while new non-Latino tenants were given the code. Squires never gave Ramos the code, though he eventually received the code from another tenant.

329. Sometime around July 2016, Ramos met prospective tenants in the building. They had asked him if he knew whether there were vacant units, and he told them that he believed that there were some vacant units being renovated. The prospective tenants then proceeded to tell Ramos that the on-site manager of the 756 Normandie building, Brian Hart, told them that he could not rent to families.

330. Ramos suffered serious injury due to Defendants' discriminatory and unlawful conduct, including substandard and unhealthy living conditions, financial costs associated with the unlawful rent increase and the unlawful detainer action, and significant emotional distress.

### *Margarita Mecinas*

331. Plaintiff Margarita Mecinas has been a tenant in the 756 Normandie building since 2008. Mecinas is a Spanish-speaking Latina woman who lives with her three children.

332. During the time that Defendants owned and managed the 756 Normandie building from 2014 to 2016, Mecinas experienced inadequate provision of maintenance and repairs, an attempt to evict her from her longtime home, and the discriminatory refusal of Defendants' employee to provide her with a standard housing service by assisting her in regaining entry to her apartment when she was locked out.

333. Mecinas' unit has mold in the bathroom, a rotted wood floor, ceiling leaks, a rusted bathtub, a loose bathroom sink, a nonfunctional closet light, a broken door hinge, a leaky faucet, bedbugs, and cockroaches.

334.    From 2015 to the time that Defendants sold the 756 Normandie building, Mecinas made numerous requests to Defendants for repairs and fumigation.

335.    Defendants either ignored Mecinas' requests or responded with poor quality and superficial partial repairs that did not fix the problems.

336.    On July 13, 2015, Defendants served Mecinas with a three-day notice to pay rent or quit. Mecinas withheld her rent for a brief period because of her overwhelming habitability issues.

337.    On August 14, 2015, Defendant Roxbury posted a notice that, beginning September 1, 2015, it would "be strictly enforcing the late fees clause" in leases.

338.    Prior to this, it was the longstanding practice in the 756 Normandie building for rent to be accepted within a brief grace period after the due date.

339.    On September 18, 2015, Mecinas asked the on-site manager of the 756 Normandie building if she could pay her rent on Monday, September 21, 2015. Permission was granted.

340.    But, on September 21, 2015, when Mecinas attempted to pay her rent in person at Defendants' office in Century City, Defendants refused to accept payment.

341.    In or around October 2015, Defendant South Normandie Properties, LLC filed an unlawful detainer action against Mecinas for failure to pay the rent that she attempted to pay in person on September 21. Defendants subsequently withdrew the unlawful detainer action on November 3, 2015.

342.    In or around March 2016, Mecinas forgot her key to her apartment and was locked out of her unit. She saw Hart walking by and asked him to help her get into her unit. Hart told her that she needed to send him an email before he could help her. Mecinas does not have access to email. She was finally able to get into her unit hours later without assistance from Hart.

343.    Defendants' conduct caused Mecinas significant injury, including emotional distress and the loss of use and enjoyment of her apartment.

## VI.   250 South Kenmore Avenue

344.   Since July 9, 2014, Defendant South Kenmore Properties, LLC has owned the apartment building located at 250 South Kenmore Avenue in Los Angeles (the "Kenmore building"). Built in 1926, the Kenmore building is a four-story, 40-unit structure consisting of 34 studio apartments and six one-bedroom apartments. Defendant South Kenmore Properties, LLC paid $3,862,500 for the Kenmore building. Defendant Roxbury provides management services for the Kenmore building on behalf of Defendant South Kenmore Properties, LLC and Defendant Optimus.

345.   After their purchase of the Kenmore building, Defendants[4] immediately set to work increasing the value of the building so that it could be "flipped" for a large profit. In this building, Defendants focused their efforts on removing tenants who are working-class, Spanish-speaking Latinos.

346.   At the Kenmore building, Defendants discriminated against Plaintiffs primarily on the basis of their national origin. To push out Plaintiffs at the Kenmore building, Defendants used the following tactics, among others: delaying, refusing, or poorly carrying out repairs, attempting to issue illegal rent increases in the form of utility charges, and treating Plaintiffs differently than the newer tenants in their rights to enjoy the property, including their rights to keep pets and method of paying rent. As a result, Plaintiffs have suffered from uninhabitable living conditions, delayed or shoddy repairs, and emotional distress, and have incurred additional costs to pay their rent.

### _Carlos and Francesca Escamilla_

347.   Plaintiffs Carlos and Francesca Escamilla have lived in the Kenmore building since 1997. The Escamillas are Spanish-speaking Latino siblings.

---

[4] For purposes of this section regarding the Kenmore building, "Defendants" refers to Defendant Optimus, Defendant Roxbury, Defendant Jerome Mickelson, and Defendant South Kenmore Properties, LLC.

1  348.   Since Defendants took over ownership and management of the

2  Kenmore building in 2014, the Escamillas have experienced many of Defendants'

3  discriminatory and abusive practices, including the failure to provide adequate

4  maintenance and repair, the imposition of burdensome rent payment terms and

5  invalid charges for utility fees, harassment, and a baseless eviction notice.

6  349.   The Escamillas' unit has mold, bedbugs, rats, cockroaches, a nail

7  protruding from the carpet, and has been without hot water in the shower for multiple

8  winter months.

9  350.   Since 2015, the Escamillas have made repeated requests for repairs to

10  Defendants.

11  351.   Defendants  have made no repairs to the Escamillas' unit.

12  352.   In fact, the on-site manager of the Kenmore building completely ignores

13  Ms. Escamilla when she calls regarding repairs, even when the manager is home.

14  353.   Eventually, Mr. Escamilla removed the moldy, bedbug-infested carpet

15  in the unit himself.

16  354.   On August 14, 2015, the Escamillas received a notice from Defendant

17  Roxbury stating that Roxbury would be "strictly enforcing the late fees clause of

18  [the] lease" and that tenants had to ensure their rent was received on time either by

19  mailing it to Defendant's Century City office prior to the first of the month or by

20  using a service from a bank to mail check payments each month.

21  355.   Prior to this notice, Mr. and Ms. Escamilla were able to submit their rent

22  by placing it in a drop box in their building. The new rent payment terms forced the

23  Escamillas to bear additional fees and created unnecessary hardship. Since the

24  elimination of the on-site payment option, the Escamillas have routinely purchased

25  money orders and certificates of mailing from the post office to prove that they

26  mailed their rent on time.

27

28

356.   Like Plaintiffs in the Magnolia building, on January 10, 2016, the Escamillas received a notice from Defendant South Kenmore Properties, LLC stating that tenants could soon begin paying their rent online.

357.   Sometime in July 2016, the Escamillas received an undated notice from Defendant Optimus explaining how to submit rent payments online through the website of Defendant Optimus.

358.   The Escamillas were unable to take advantage of this new system, however, because they did not have a computer, email addresses, bank accounts or internet access. The online system excluded the Escamillas and catered to the new, younger English-speaking tenants moving into renovated units in the Kenmore building.

359.   On July 8, 2016, the Escamillas received a notice from Defendants on Optimus letterhead regarding utility fees. The notice stated that beginning in August 2016, the Escamillas would be receiving a monthly bill for water and waste services. Additionally, the notice stated that Defendants would be implementing a seven-dollar flat fee for trash collection.

360.   Since they moved into the unit in 1997, the Escamillas had never paid for water or trash collection. Because the implementation of these new costs did not reduce the Escamillas' rent, the additional costs constituted invalid rent increases.

361.   On August 1, 2016, the Escamillas received a notice from Defendant Roxbury regarding a new "Walk-in Payment System" program. This program was for tenants to pay rent in cash at various retail locations. This program included a three-dollar processing fee.

362.   Mr. Escamilla used this payment method to pay his September 2016 rent and paid the three-dollar processing fee.

363.   The new tenants who are able to pay their rent using the online system are not required to pay this additional fee.

364.   Like other Plaintiffs, the Escamillas have suffered harassment by Defendants. On one occasion, Defendants' previous on-site manager of the Kenmore building, Brianna Kelly, called the police on Mr. Escamilla, stating that he was making a lot of noise. When the police arrived, Mr. Escamilla was sound asleep and silent.

365.   Defendants' current on-site manager at the Kenmore building, Edith Dueñas, regularly complains about the Escamillas' two small dogs, but many of the newer tenants in the Kenmore building also have dogs and the manager does not complain about their dogs.

366.   At the beginning of September 2016, Dueñas told Mr. Escamilla that he needed to pay $250 for each dog.

367.   As Defendants were aware, the Escamillas have had their dogs for approximately one year as of September 2016. Never before had any managers mentioned anything about their dogs.

368.   On September 6, 2016, an eviction notice was posted on Mr. and Ms. Escamilla's door requiring them to remove their pets within three days or vacate the unit. Other tenants in the building have dogs and none of them received eviction notices. Attached to this notice was a lease application in English, with a "post-it" note stating, in Spanish, that they needed to apply immediately.

369.   Defendants' unlawful and discriminatory conduct has created significant hardship for the Escamillas, imposing increased costs, unacceptable living conditions, anxiety and emotional distress.

### *Polonia Hernandez*

370.   Plaintiff Polonia Hernandez has lived in the Kenmore building since 1994. Hernandez is a Spanish-speaking Latina woman and lives with her adult son.

371.   Since Defendants took over ownership and management of the Kenmore building in 2014, they have failed to provide adequate maintenance and

repair services to remedy the serious problems in Hernandez's unit. Instead, they have imposed additional charges for utilities, constituting an invalid rent increase.

372.   Since Defendants acquired the building, the conditions of Hernandez's unit have worsened, while the rest of the building is renovated for new, younger, English-speaking tenants.

373.   Hernandez's unit is infested with cockroaches and rodents. Her kitchen sink is old and falling apart. The wood under her kitchen sink is rotten. Her cabinets are in bad condition. There is mildew in the bathroom, and there are cracks in the ceiling. The carpet in her unit has not been replaced in fifteen years.

374.   On December 7, 2015, Hernandez submitted a request for repairs to Defendants regarding each of these issues. The sole maintenance provided by Defendants was to paint over the mildew. All of the other problems in the unit are outstanding.

375.   Sometime in December 2015, the hot water stopped working in Hernandez's shower. Hernandez submitted another written complaint to Defendants.

376.   Hernandez has received many notices from Defendants about shutting off the water in the building, however, the hot water in her shower has never been fixed.

377.   On September 1, 2016, Hernandez received a bill from a utility company for $63.28 to pay for water, sewer and trash for the month of July 2016. Hernandez has never paid for these utilities in her twenty-two years of tenancy at the Kenmore building. Hernandez never received a notice from Defendants warning her that she would have to pay for these utilities prior to receiving this bill. Defendants have not reduced her rent to account for these new charges. These additional costs are invalid rent increases.

378.   Defendants' refusal to make repairs to Hernandez's unit while the building and many other units have gone through significant renovations has greatly inconvenienced Hernandez and caused her stress.

**VII.   837 South Normandie Avenue**

379.   Since February 26, 2015, Defendant Normandie Linden, LLC has owned the apartment building located at 837 South Normandie Avenue in Los Angeles (the "837 Normandie building"). Built in 1925, the 837 Normandie building is a two-story, 16-unit structure consisting of 16 one-bedroom units. Defendant Normandie Linden, LLC paid $2,200,000 for the 837 Normandie building. Defendant Roxbury provides management services for the 837 Normandie building on behalf of Defendant Normandie Linden, LLC and Defendant Optimus.

380.   After their purchase of the 837 Normandie building, Defendants[5] immediately set to work increasing the value of the building so that they could flip it for a large profit. In this building, Defendants focused their efforts on removing tenants with apparent mental disabilities.

381.   At the 837 Normandie building, Defendants discriminated against Plaintiffs primarily on the basis of their disability, explicitly telling Plaintiffs that Defendants planned to rid the building of persons with mental disabilities. To push out Plaintiffs at the 837 Normandie building, Defendants used the following tactics, among others: delaying or refusing repairs and maintenance services, issuing baseless eviction notices, attempting to illegally increase rent, and refusing reasonable accommodations. As a result, Plaintiffs have suffered from uninhabitable living conditions, threats to their ability to remain housed, and emotional distress.

### *Demetrius Allen*

382.   Plaintiff Demetrius Allen has been a tenant at the 837 Normandie building since 2012. Allen is an African-American man with a mental disability who receives a Section 8 housing subsidy.

---

[5] For purposes of this section regarding the 837 Normandie building, "Defendants" refers to Defendant Optimus, Defendant Roxbury, Defendant Jerome Mickelson, and Defendant Normandie Linden, LLC.

383.   Since Defendants took over ownership and management of the 837 Normandie building in 2015, Allen experienced many of Defendants' discriminatory and unlawful practices, including the failure to provide needed maintenance to his unit, unlawful and baseless eviction threats, and invalid rent increases.

384.   Allen had been chronically homeless prior to moving into the building. He then began receiving assistance from a caseworker at Ocean Park Community Center, who helped him obtain a Section 8 voucher. This allowed him to move into the 837 Normandie building.

385.   In early 2015, shortly after Defendant Normandie Linden, LLC acquired the 837 Normandie building, it immediately began making major renovations to some of the units and common areas. These renovations made it very difficult for Allen to leave his apartment.

386.   Shortly after Defendant Normandie Linden, LLC acquired the building, the on-site manager, known only as Amelia, told Allen and another tenant that Defendants planned to rid the building of persons with mental disabilities.

387.   On May 13, 2015, Allen received a notice to pay rent or quit even though he had already paid his rent.

388.   On June 4, 2015, Allen received a notice to pay rent or quit even though he had already paid his rent.

389.   In June 2015, bedbugs infested Allen's apartment. Allen filed a complaint with Defendants but never received a response.

390.   On June 23, 2015, Allen received a notice purporting to terminate his Section 8 subsidy, similar to the Section 8 Termination Notice received by Plaintiffs Reynolds and Rivera at the Mariposa building in November 2014. As outlined above with regard to tenants of the Mariposa building, the notice received by Allen was unlawful and invalid because a landlord may not terminate acceptance of a tenant's Section 8 subsidy without valid and independent legal cause to evict that tenant.

391.   Believing that he had to move, Allen sent a letter to Defendant Mickelson on June 24, 2015 stating that he would find a new apartment.

392.   Allen subsequently met with legal counsel and learned that the eviction notice was invalid. Allen then sent another letter to Defendant Mickelson, rescinding his June 24, 2015 letter and explaining that the eviction notice was invalid.

393.   On November 10, 2015, Allen received a notice to pay rent or quit even though he had already paid his rent.

394.   On December 9, 2015, Defendant Normandie Linden, LLC sent Allen an eviction notice alleging that he owed an additional $151.29, based on an apparent rent increase.

395.   Because Allen is a recipient of Section 8 housing assistance, HACLA must first approve any rent increases. Defendant Normandie Linden, LLC neither sought nor obtained such approval.

396.   On December 19, 2015, Allen sent Defendant Optimus' manager McCain a letter explaining that any rent increase not previously approved by HACLA was unlawful and failed to meet the requirements of his lease or of federal law. McCain neither responded to this letter nor rescinded the notice.

397.   Defendant Normandie Linden, LLC continued sending Allen eviction notices even though he faithfully paid his rent each month and notified the managers that rent increases require HACLA approval.

398.   On February 10, 2016, Defendant Normandie Linden, LLC sent Allen another eviction notice demanding payment of $1,143.67 in rent, even though Allen and HACLA paid their respective portions of his February rent. McCain never rescinded the notice.

399.   On February 22, 2016, Defendant Normandie Linden, LLC posted another eviction notice on Allen's door, stating that he was required to remove his dog from his unit or vacate.

400.   On March 1, 2016, Allen responded to the notice in a letter to Defendant Normandie Linden, LLC. He expressed his belief that the February 22 eviction notice was issued in retaliation for his assertion of his rights. He explained that a prior landlord had approved his dog and that during his time living in the building no manager has ever told him that he was not allowed to have a dog. Allen never received a response to his letter or a rescission of the notice.

401.   On March 11, 2016, Defendant Normandie Linden, LLC sent Allen yet another eviction notice, this time demanding payment of $515.36 in rent.

402.   Five days later, Allen sent a letter, a copy of the money order he used to pay his rent, and an explanation that any attempt to increase his rent without HACLA approval is illegal and fails to meet the requirements of his lease or of federal law. Defendants neither responded to this communication nor rescinded the notice.

403.   On April 15, 2016, Defendant Normandie Linden, LLC sent an eviction notice for $275.05, and Allen responded with a letter and proof of mailing of his check. Again, Defendants neither responded nor rescinded the notice.

404.   On May 13, 2016, Defendant Normandie Linden, LLC sent Allen another eviction notice demanding payment of rent, even though Allen had paid his rent that month.

405.   On August 11, 2016, Defendant Normandie Linden, LLC sent Allen an eviction notice demanding payment of rent, although Allen had paid his rent for August.

406.   On August 29, 2016, Defendant Normandie Linden, LLC sent Allen a notice on Optimus letterhead regarding utility fees. The notice stated that, beginning in November, Allen would receive a monthly bill for water and waste services. Additionally, the notice stated that Defendants would be implementing a ten-dollar flat fee for trash collection. Since moving into the unit, Allen has never paid for water or trash collection. Defendants have not reduced Allen's rent to reflect these changes. These additional costs are invalid rent increases.

407.   On September 12, 2016, Defendant Normandie Linden, LLC posted an eviction notice on Allen's door stating that Allen violated his lease by having an unauthorized individual living in the unit. The notice also stated that Allen was required within three days to remove all pets from his unit or vacate.

408.   The notice was unclear and confusing to Allen. Allen had already explained to Defendant Normandie Linden, LLC in March that the previous landlord approved him having a dog and never received a response. Furthermore, no one besides Allen lives in his unit.

409.   Defendants' discriminatory and unlawful treatment of Allen through incessant eviction notices, invalid increases to his rent, and the failure to provide needed maintenance has caused Allen extreme stress and has exacerbated his disability. Without the support of pro bono counsel, Allen would likely have lost his housing, facing the risk of returning to homelessness.

### *Michael Prudhomme*

410.   Plaintiff Michael Prudhomme has been a tenant of the 837 Normandie building since 2008. Prudhomme, who has a mental disability, receives a Section 8 housing subsidy.

411.   Since Defendants took over ownership and management of the 837 Normandie building in 2015, Prudhomme experienced many of Defendants' discriminatory and unlawful practices, including the imposition of burdensome changes to rent payment terms, unlawful and baseless eviction threats, and invalid rent increases.

412.   In early 2015, when Defendant Normandie Linden, LLC bought the 837 Normandie building, it began to require that the rent be mailed or delivered to Defendants' Century City office. Defendant made clear that it would no longer accept payment of rent at the 837 Normandie building.

413.   Worried about mailing his rent, Prudhomme has enlisted his caretaker to drop off the rent payment at the Century City office when he is able to do so.

414.   On September 29, 2015, Prudhomme received a notice from Defendant Roxbury stating that they were working on developing a "convenient platform" for tenants to pay rent online. This notice stated that the system would enable tenants to pay their rent online with a debit or credit card, review their ledger and submit maintenance requests. The notice requested that tenants provide their email addresses to the on-site manager.

415.   Prudhomme has been unable to take advantage of this new system because he does not have consistent access to a computer and the internet. The online system caters to the new, younger, non-disabled tenants who have moved into the 837 Normandie building's renovated units.

416.   On December 9, 2015, Defendant Normandie Linden, LLC sent an eviction notice demanding Prudhomme pay an additional $117.12 for December's rent.

417.   Like the notices sent to Allen, this notice constituted an unlawful attempt to circumvent the HACLA approval process for increasing rent. Prudhomme sent McCain a letter explaining the steps Defendants would have to take to increase his rent, but he received no response.

418.   Prudhomme paid his February 2016 rent by sending a check in the mail, as his caretaker was unable to personally deliver the rent that month.

419.   On February 10, 2016, Defendant Normandie Linden, LLC sent Prudhomme an eviction notice demanding $238.61 for February rent.

420.   Due to the notice, Prudhomme had to cancel the check and have his caretaker personally deliver another check to Defendants' Century City office.

421.   On May 13, 2016, Defendant Normandie Linden, LLC sent Prudhomme an eviction notice demanding payment of $786.61 for May's rent, even though Prudhomme had already paid his portion of rent for May.

422.   Prudhomme's counsel submitted a complaint to HCIDLA regarding the May eviction notice. Only after this complaint was submitted did Defendants

1  confirm that Prudhomme was current on his rent payments and state that the notice
2  should be disregarded.

3      423.   On August 29, 2016, Prudhomme received a notice from Defendants, on
4  Optimus letterhead, regarding utility fees. The notice stated that, beginning in
5  November 2016, Prudhomme would be receiving a monthly bill for water and waste
6  services. Additionally, the notice stated that Defendants would be implementing a
7  ten-dollar flat fee for trash collection.

8      424.   Since moving into the unit, Prudhomme has never paid for water or
9  trash collection. Even after the implementation of these new costs, Defendants did
10 not reduce Prudhomme's rent to reflect the changes. These additional costs therefore
11 constitute invalid rent increases.

12     425.   Defendants' unlawful efforts to increase Prudhomme's rent and threaten
13 him with eviction have caused Prudhomme extreme stress and have exacerbated his
14 disability.

15                            **LEGAL CLAIMS**
16                       **FIRST CAUSE OF ACTION**
17  **(All Plaintiffs Against All Defendants for Violations of the Fair Housing Act, 42**
18             **U.S.C. §§ 3601-3619; 24 C.F.R. §§ 100.60-100.85)**

19     426.   Plaintiffs reallege and incorporate by reference each paragraph
20 previously alleged in this Complaint.

21     427.   The Individual Plaintiffs are all members of protected classes under the
22 FHA. Plaintiffs Reynolds, Allen, Prudhomme, and Rivera are each persons with a
23 disability. Plaintiffs Martinez, Velasquez, Fabian, Castro, Mecinas, and Ramos are
24 Spanish-speaking Latino tenants with children. Plaintiffs Deras, Gregorio,
25 Hernandez, and Francesca and Carlos Escamilla are Spanish-speaking Latino
26 tenants. The Organizational Plaintiffs serve individuals who are members of these
27 protected classes.

28

428.   Based on Defendants' comments and actions herein alleged, Plaintiff tenants allege and believe Defendants' conduct is motivated by discriminatory intent based on the Individual Plaintiffs' membership in protected classes in contravention of 42 U.S.C. § 3604.

429.   Defendants' actions in furtherance of their Koreatown Strategy herein alleged, if facially neutral, have had a discriminatory impact on Latino tenants, tenant families with children, and tenants with mental disabilities living in Defendants' buildings, and are not supported by any substantial and legitimate nondiscriminatory objectives, in contravention of 42 U.S.C. § 3604.

430.   Defendants have sought to make housing unavailable to and have interfered with the exercise or enjoyment of housing rights by Plaintiffs Reynolds, Rivera, Martinez, Castro, Deras, Velasquez, Fabian, Ramos, Mecinas, Carlos and Francesca Escamilla, Allen, and Prudhomme by serving them with baseless or unwarranted eviction notices and other notices or documents designed to pressure them to move, and by making other threats of eviction, because of race, national origin, familial status, and/or disability status in violation of 42 U.S.C. §§ 3604(a), 3604(f)(1), 3617, and 24 C.F.R. § 100.60(b)(5). By these same actions, Defendants have discriminated against Plaintiffs Reynolds, Rivera, Martinez, Castro, Deras, Velasquez, Fabian, Ramos, Mecinas, Carlos and Francesca Escamilla, Allen, and Prudhomme in the terms and conditions of their tenancy because of race, national origin, familial status, and/or disability status in violation of 42 U.S.C. §§ 3604(b) and 3604(f)(2).

431.   Defendants have discriminated against Plaintiffs Martinez, Velasquez, Fabian, Deras, Castro, Gregorio, Ramos, Mecinas, Carlos and Francesca Escamilla, Hernandez, and Allen in the terms and conditions of their tenancy and the provision of facilities or services in connection therewith because of race, national origin, familial status, and/or disability status by denying or delaying maintenance services and repairs or providing substandard workmanship, fixtures, and repairs, to those

1   tenants' units while providing freshly renovated units in good and sanitary condition

2   to new tenants who are English-speaking, childless, and without mental disabilities,

3   in violation of 42 U.S.C. §§ 3604(b), 3604(f)(2), and 24 C.F.R. § 100.65(b)(2).

4       432.   Defendants have subjected all Plaintiff tenants to harassment that has

5   the effect of imposing different terms, conditions, or privileges relating to the rental

6   of a dwelling or denying or limiting services in connection therewith on the basis of

7   race, national origin, familial status, and/or disability status in violation of 42 U.S.C.

8   § 3604(b), and/or constitutes unwelcome conduct that is sufficiently severe or

9   pervasive as to interfere with the use or enjoyment of Plaintiff tenants' rental

10  dwellings and the terms, conditions, and privileges thereof, in violation of 24 C.F.R.

11  § 100.65(b)(4). This harassment has included derogatory comments based on

12  Plaintiff tenants' disability status or national origin, coercive and threatening conduct

13  or notices designed to intimidate Plaintiff tenants, and the imposition of substandard

14  living conditions and unduly oppressive and burdensome rules.

15      433.   Defendants Optimus, Roxbury, and Magnolia Avenue Properties, LLC

16  subjected Plaintiffs Martinez, Velasquez, Fabian, and Castro to discrimination in the

17  terms, conditions, or privileges of their tenancy and the provision of facilities in

18  connection therewith on the basis of familial status by prohibiting children from

19  reasonable use of the common areas in violation of 42 U.S.C. § 3604(b). Moreover,

20  Defendants responded with threats and intimidation targeted at Plaintiffs Martinez,

21  Velasquez, Fabian, and Castro based on their children's use of common areas and

22  their own opposition to Defendants' discriminatory policy, in violation of 42 U.S.C.

23  § 3617.

24      434.   Defendants have injured Plaintiffs Rivera, Martinez, Velasquez, Fabian,

25  Deras, Castro, Ramos, Carlos and Francesca Escamilla, and Prudhomme by

26  imposing unduly oppressive changes in the terms of their tenancy related to rent

27  collection that have a discriminatory impact on Latino tenants and tenants with

28

mental disabilities living in Defendants' buildings, in violation of 42 U.S.C. §§ 3604(b) and 3604(f)(2).

435.   Defendants have discriminated against Latino tenants in the terms, conditions, and privileges of their tenancy or the provision of services and facilities in connection therewith on the basis of national origin by unreasonably refusing to post or explain notices in Spanish, in violation of 42 U.S.C. § 3604(b).

436.   Defendants have, for profit, induced or attempted to induce any person to sell or rent any dwelling by representations regarding the entry or prospective entry into the neighborhood of a person or persons of a particular race, disability, familial status, or national origin, in violation of 42 U.S.C. § 3604(e) and 24 C.F.R. §§ 100.70-100.85.

437.   Defendants have indicated a preference for limiting the rental of dwellings on the basis of race, national origin, familial status and disability, including but not limited to discriminatory statements to tenants, including Plaintiffs, and selection of media for advertising the rental of dwellings which deny particular segments of the housing market information about housing opportunities based on race, national origin, familial status or disability in violation of 42 U.S.C. § 3604(c) and 24 C.F.R. §§ 100.70-100.85.

438.   Defendants have implemented practices that have the effect of limiting or denying access to their rental dwellings based on race, national origin, familial status or disability pursuant to their Koreatown Strategy.

439.   Defendants Optimus, Roxbury, and Mariposa/8th Street Properties, LLC refused to respond to or consistently comply with Plaintiffs Reynolds and Rivera's requests for reasonable accommodation in violation of 42 U.S.C. § 3604(f)(3)(B).

440.   Defendants Optimus, Roxbury, and Magnolia Avenue Properties, LLC retaliated against Plaintiffs Martinez, Fabian, Deras, Ramos, and Mecinas by instituting unlawful detainer actions against those Plaintiffs after they engaged in activity protected by the FHA in violation of 42 U.S.C. § 3617.

441.   The abusive and discriminatory practices of Defendants Optimus, Roxbury, and Mariposa/8th Street Properties, LLC described above have frustrated Step Up's mission to secure permanent housing and provide supportive services for individuals with mental disabilities, including the formerly homeless. Step Up has been forced to divert its scarce resources to protect its clients from the illegal and discriminatory conduct.

442.   The abusive and discriminatory practices of Defendants Optimus, Roxbury, and Magnolia Avenue Properties, LLC described above frustrated SAJE's mission of building leadership and changing corporate policy, including by enforcing tenant rights and assisting tenants in achieving healthy living conditions. SAJE was forced to divert its scarce resources to investigating the mistreatment of Latino tenants and tenant families with children at the Magnolia building, and to assisting tenants in opposing the illegal and discriminatory conduct.

443.   Defendants' conduct was intentional, willful, and made in reckless disregard of the known rights of others.

## SECOND CAUSE OF ACTION

**(All Plaintiffs Against All Defendants for Violations of the California Fair Employment and Housing Act, Cal. Gov't Code §§ 12900-12996)**

444.   Plaintiffs reallege and incorporate by reference each paragraph previously alleged in this Complaint.

445.   Based on Defendants' comments and actions herein alleged, Plaintiff tenants allege and believe Defendants' conduct is motivated by discriminatory intent based on Plaintiffs' membership in protected classes in contravention of Cal. Gov't Code §§ 12955(a), (d) & (k) & 12955.8(a).

446.   Defendants' actions in furtherance of their Koreatown Strategy herein alleged, if facially neutral, have had a discriminatory impact on Latino tenants, tenant families with children, and tenants with mental disabilities living in Defendants' buildings, and are not supported by any substantial and legitimate

1  nondiscriminatory objectives, in contravention of Cal. Gov't Code §§ 12955(a), (d)
2  & (k) & 12955.8(b).

3      447.  Defendants have sought to make housing unavailable to and have
4  interfered with the exercise or enjoyment of housing rights by Plaintiffs Reynolds,
5  Rivera, Martinez, Castro, Deras, Velasquez, Fabian, Allen, and Prudhomme by
6  serving them with baseless or unwarranted eviction notices that were not served in
7  good faith or in anticipation of litigation that was seriously contemplated at the time,
8  and/or other notices or documents designed to pressure them to move, and by
9  making other threats of eviction, because of race, national origin, familial status,
10  and/or disability status in violation of Cal. Gov't Code § 12955.7. By these same
11  actions, Defendants have discriminated against Plaintiffs Reynolds, Rivera,
12  Martinez, Castro, Deras, Velasquez, Fabian, Allen, and Prudhomme in the terms and
13  conditions of their tenancy because of race, national origin, familial status, and/or
14  disability status in violation of Cal. Gov't Code § 12955(a), (d) & (k).

15      448.  Defendants have discriminated against Plaintiffs Martinez, Velasquez,
16  Fabian, Deras, Castro, Gregorio, Ramos, Mecinas, Carlos and Francesca Escamilla,
17  Hernandez, and Allen in the terms and conditions of their tenancy and the provision
18  of facilities or services in connection therewith because of race, national origin,
19  familial status, and/or disability status by denying or delaying maintenance services
20  and repairs, or providing substandard workmanship, fixtures, and repairs, to those
21  tenants' units while providing freshly renovated units in good and sanitary condition
22  to new tenants who are English-speaking, childless, and without mental disabilities,
23  in violation of Cal. Gov't Code § 12955(a), (d) & (k).

24      449.  Defendants have subjected all Plaintiff tenants to harassment that has
25  the effect of imposing different terms, conditions, or privileges relating to the rental
26  of a dwelling or denying or limiting services in connection therewith on the basis of
27  race, national origin, familial status, and/or disability status in violation of Cal. Gov't
28  Code § 12955(a), (d) & (k), and/or constitutes unwelcome conduct that is sufficiently

severe or pervasive as to interfere with the use or enjoyment of Plaintiff tenants' rental dwellings and the terms, conditions, or privileges thereof, in violation of Cal. Gov't Code § 12955(a), (d) & (k). This harassment has included derogatory comments based on Plaintiff tenants' disability status or national origin, coercive and threatening conduct or notices designed to intimidate Plaintiff tenants, and the imposition of substandard living conditions and unduly oppressive and burdensome rules.

450.   Defendants Optimus, Roxbury, and Magnolia Avenue Properties, LLC subjected Plaintiffs Martinez, Velasquez, Fabian, and Castro to discrimination in the terms, conditions, or privileges of their tenancy and the provision of facilities in connection therewith on the basis of familial status by prohibiting children from reasonable use of the common areas in violation of Cal. Gov't Code § 12955(a). Moreover, Defendants responded with threats and intimidation targeted at Plaintiffs Martinez, Velasquez, Fabian, and Castro based on their children's use of common areas and their own opposition to Defendants' discriminatory policy, in violation of Cal. Gov't Code § 12955(a), (d) & (k).

451.   Defendants have injured Plaintiffs Rivera, Martinez, Velasquez, Fabian, Deras, Castro, Ramos, Carlos and Francesca Escamilla, and Prudhomme by imposing unduly oppressive changes in the terms of their tenancy related to rent collection that have a discriminatory impact on Latino tenants and tenants with mental disabilities living in Defendants' buildings, in violation of Cal. Gov't Code § 12955(a), (d) & (k).

452.   Defendants have discriminated against Latino tenants in the terms, conditions, and privileges of their tenancy or the provision of services and facilities in connection therewith on the basis of national origin by unreasonably refusing to post or explain notices in Spanish, in violation of Cal. Gov't Code § 12955(a), (d) & (k), causing them economic damages and emotional distress.

453.   Defendants Optimus, Roxbury, and Mariposa/8th Street Properties, LLC refused to respond to or consistently comply with Plaintiffs Reynolds and Rivera's requests for reasonable accommodation in violation of Cal. Gov't Code § 12955(a), (d) & (k).

454.   Defendants Optimus, Roxbury, and Magnolia Avenue Properties, LLC retaliated against Plaintiffs Martinez, Fabian, Deras, Ramos, and Mecinas by instituting unlawful detainer actions against those Plaintiffs after they engaged in activity protected by the FEHA in violation of Cal. Gov't Code §§ 12955(f) and 12955.7.

455.   The abusive and discriminatory practices of Defendants Optimus, Roxbury, and Mariposa/8th Street Properties, LLC described above have frustrated Step Up's mission to secure permanent housing and provide supportive services for individuals with mental disabilities, including the formerly homeless. Step Up has been forced to divert its scarce resources to protect its clients from the illegal and discriminatory conduct.

456.   The abusive and discriminatory practices of Defendants Optimus, Roxbury, and Magnolia Avenue Properties, LLC described above frustrated SAJE's mission of building leadership and changing corporate policy, including by enforcing tenant rights and assisting tenants in achieving healthy living conditions. SAJE was forced to divert its scarce resources to investigating the mistreatment of Latino tenants and tenant families with children at the Magnolia building, and to assisting tenants in opposing the illegal and discriminatory conduct, causing them damages in an amount to be determined.

457.   Defendants made, printed, or published, or caused to be made, printed, or published, notices, statements, or  advertisements, with respect to the sale or rental of housing accommodations, that indicated a preference, limitation, or discrimination based on race, color, marital status, national origin, ancestry, familial status, source

1  of income, or disability or an intention to make that preference, limitation, or
2  discrimination in violation of Cal. Gov't Code § 12955(c).

3      458.   Defendants, for profit, induced persons to rent dwellings by
4  representations regarding the entry or prospective entry into the neighborhood of a
5  person or persons of a particular race, color, marital status, ancestry, disability,
6  source of income, familial status, or national origin in violation of Cal. Gov't Code §
7  12955(h).

8      459.   Defendants aided, abetted, incited, compelled, or coerced the conduct
9  described herein, or attempted to do so, in violation of Cal. Gov't Code § 12955(g).

10     460.   Defendants' conduct was intentional, willful, and made in reckless
11 disregard of the known rights of others.

12              **THIRD CAUSE OF ACTION**
13 **(Individual Plaintiffs Against All Defendants for Violations of the Unruh Civil**
14                **Rights Act, Cal. Civ. Code § 51)**

15     461.   Plaintiffs reallege and incorporate by reference each paragraph
16 previously alleged in this Complaint.

17     462.   Defendants Normandie Linden, LLC, Mickelson, Optimus, and
18 Roxbury injured Plaintiff Allen in violation of the Unruh Civil Rights Act, Cal. Civ.
19 Code § 51. Specifically, (1) Plaintiff Allen is a person with a disability who receives
20 Section 8 housing subsidies; (2) Defendants denied Allen equal accommodations,
21 advantages, facilities, privileges, or services by threatening him with baseless
22 eviction notices that were not served in good faith or in anticipation of litigation that
23 was seriously contemplated at the time, making discriminatory statements and threats
24 of eviction, failing to maintain his unit in habitable condition, imposing unduly
25 oppressive changes in the terms of his tenancy, and enforcing policies in a
26 discriminatory fashion; (3) Allen's disability was a substantial motivating reason for
27 Defendants' conduct; (4) Allen has suffered harm; and (5) Defendants' conduct was
28 a substantial factor in causing the harm suffered by Allen.

463.   Defendants Mariposa/8th Street Properties, LLC, Normandie Linden, LLC, Mickelson, Optimus, and Roxbury injured Plaintiffs Prudhomme, Reynolds, and Rivera in violation of the Unruh Civil Rights Act, Cal. Civ. Code § 51. Specifically, (1) Plaintiffs Prudhomme, Reynolds, and Rivera are all persons with disabilities who receive Section 8 housing subsidies; (2) Defendants denied Prudhomme, Reynolds, and Rivera equal accommodations, advantages, facilities, privileges, or services by threatening them with baseless eviction notices that were not served in good faith or in anticipation of litigation that was seriously contemplated at the time, making discriminatory statements and threats of eviction, imposing unduly oppressive changes in the terms of their tenancies, and enforcing policies in a discriminatory fashion; (3) Prudhomme's, Reynolds's, and Rivera's disabilities were substantial motivating reasons for Defendants' conduct; (4) Prudhomme, Reynolds, and Rivera have suffered harm; and (5) Defendants' conduct was a substantial factor in causing the harm suffered by Prudhomme, Reynolds, and Rivera.

464.   Defendants Magnolia Avenue Properties, LLC, Mickelson, Optimus, and Roxbury injured Plaintiff Martinez in violation of the Unruh Civil Rights Act, Cal. Civ. Code § 51. Specifically, (1) Plaintiff Martinez is a Spanish-speaking Latina woman who lives with her minor children; (2) Defendants denied Martinez equal accommodations, advantages, facilities, privileges, or services by threatening her with baseless eviction notices that were not served in good faith or in anticipation of litigation that was seriously contemplated at the time, making discriminatory statements and threats of eviction, failing to maintain her unit in habitable condition, imposing unduly oppressive changes in the terms of her tenancy, and enforcing policies in a discriminatory fashion; (3) the Latina background, primary language, and familial status of Martinez were substantial motivating reasons for Defendants' conduct; (4) Martinez has suffered harm; and (5) Defendants' conduct was a substantial factor in causing the harm suffered by Martinez.

465.    Defendants Magnolia Avenue Properties, LLC, South Normandie Properties, LLC, Mickelson, Optimus, and Roxbury injured Plaintiffs Castro, Fabian, Mecinas, Ramos, and Velasquez in violation of the Unruh Civil Rights Act, Cal. Civ. Code § 51. Specifically, (1) Plaintiffs Castro, Fabian, Mecinas, Ramos, and Velasquez are all Spanish-speaking Latino individuals who live with their minor children; (2) Defendants denied Castro, Fabian, Mecinas, Ramos, and Velasquez full and equal accommodations, advantages, facilities, privileges, or services by making discriminatory statements and threats of eviction, failing to maintain their units in habitable condition, imposing unduly oppressive changes in the terms of their tenancies, and enforcing policies in a discriminatory fashion; (3) the Latino background, primary language, and familial status of Castro, Fabian, Mecinas, Ramos, and Velasquez were substantial motivating reasons for Defendants' conduct; (4) Castro, Fabian, Mecinas, Ramos, and Velasquez have suffered harm; and (5) Defendants' conduct was a substantial factor in causing the harm suffered by Castro, Fabian, Mecinas, Ramos, and Velasquez.

466.    Defendants Magnolia Avenue Properties, LLC, Mickelson, Optimus, and Roxbury injured Plaintiff Deras in violation of the Unruh Civil Rights Act, Cal. Civ. Code § 51. Specifically, (1) Plaintiff Deras is a Spanish-speaking Latina woman; (2) Defendants denied Deras full and equal accommodations, advantages, facilities, privileges, or services by threatening her with a baseless eviction notice that was not served in good faith or in anticipation of litigation that was seriously contemplated at the time, failing to maintain her unit in habitable condition, imposing unduly oppressive changes in the terms of her tenancy, and enforcing policies in a discriminatory fashion; (3) the Latina background and primary language of Deras were substantial motivating reasons for Defendants' conduct; (4) Deras has suffered harm; and (5) Defendants' conduct was a substantial factor in causing the harm suffered by Deras.

467.   Defendants South Kenmore Properties, LLC, South Normandie Properties, LLC, Mickelson, Optimus, and Roxbury injured Plaintiffs Carlos and Francesca Escamilla, Gregorio, and Hernandez in violation of the Unruh Civil Rights Act, Cal. Civ. Code § 51. Specifically, (1) Plaintiffs Carlos and Francesca Escamilla, Gregorio, and Hernandez are Spanish-speaking Latino individuals; (2) Defendants denied Deras, Carlos and Francesca Escamilla, Gregorio, and Hernandez full and equal accommodations, advantages, facilities, privileges, or services by failing to maintain their units in habitable condition, imposing unduly oppressive changes in the terms of their tenancies, and enforcing policies in a discriminatory fashion; (3) the Latino background and primary language of Carlos and Francesca Escamilla, Gregorio, and Hernandez were substantial motivating reasons for Defendants' conduct; (4) Carlos and Francesca Escamilla, Gregorio, and Hernandez have suffered harm; and (5) Defendants' conduct was a substantial factor in causing the harm suffered by Carlos and Francesca Escamilla, Gregorio, and Hernandez.

## **FOURTH CAUSE OF ACTION**

**(Plaintiffs Allen, Castro, Deras, Carlos Escamilla, Francesca Escamilla, Fabian, Gregorio, Hernandez, Martinez, Mecinas, Ramos, and Velasquez Against Defendants Magnolia Avenue Properties, LLC, Normandie Linden, LLC, South Kenmore Properties, LLC, South Normandie Properties, LLC, Mickelson, Optimus, and Roxbury for Statutory Habitability Claims, Cal. Civ. Code § 1941.1; Cal. Health and Safety Code § 17920.3)**

468.   Plaintiffs reallege and incorporate by reference each paragraph previously alleged in this Complaint.

469.   Defendants Magnolia Avenue Properties, LLC, Normandie Linden, LLC, South Kenmore Properties, LLC, South Normandie Properties, LLC, Mickelson, Optimus, and Roxbury injured Plaintiffs Allen, Castro, Deras, Carlos Escamilla, Francesca Escamilla, Fabian, Gregorio, Hernandez, Martinez, Mecinas,

Ramos, and Velasquez by breaching the warranty of habitability in violation of Cal. Civ. Code § 1941.1 and Cal. Health and Safety Code § 17920.3.

470.   Defendants failed to maintain Plaintiffs' units in habitable condition by, among other things, failing to substantially meet the standards set forth in Cal. Civ. Code § 1941.1 and Cal. Health and Safety Code § 17920.3. For example, Defendants failed to keep Plaintiffs' units free of infestations of bedbugs, cockroaches, and rodents; failed to provide Plaintiffs with hot and/or cold water for long periods of time; failed to provide plumbing facilities that were in good working order; failed to repair leaks in ceilings, holes in walls, and broken windows and doors; failed to maintain electrical equipment, including lighting and smoke detectors, in good working order; and failed to keep the premises sanitary and free of dangerous conditions like mold, peeling paint, protruding nails, and warped floors. Plaintiffs did not contribute substantially to these defective conditions.

471.   Defendants should have discovered these defective conditions through reasonable inspections. Moreover, Plaintiffs also repeatedly notified Defendants of these defective conditions through numerous written and oral requests for repairs made to Defendants and their agents. In fact, many Plaintiffs also filed numerous complaints with the Department of Public Health and HCIDLA, which conducted many inspections of Defendants' properties.

472.   Despite being on actual and constructive notice of the defective conditions in Plaintiffs' units, Defendants frequently made no attempt to repair those conditions. When Defendants did attempt to make repairs, their repairs were inadequate and did not remedy the defective conditions.

473.   As a result of Defendants' failure to maintain Plaintiffs' units in habitable condition, Plaintiffs have suffered both emotional distress and economic loss.

# FIFTH CAUSE OF ACTION

## (Individual Plaintiffs Against All Defendants for Breaches of Quiet Enjoyment, Cal. Civ. Code § 1927)

474.   Plaintiffs reallege and incorporate by reference each paragraph previously alleged in this Complaint.

475.   Defendants injured the Individual Plaintiffs by depriving Plaintiffs of the beneficial enjoyment of the premises or rendering the premises unfit for the purposes for which they are let, in violation of California Civil Code § 1927.

476.   Specifically, Defendants have substantially interfered with Plaintiffs' right to use the premises leased from Defendants by, among other things, (1) threatening Plaintiffs with baseless eviction notices that were not served in good faith or in anticipation of litigation that was seriously contemplated at the time; (2) failing to maintain Plaintiffs' units in habitable condition; (3) making false, threatening, and derogatory statements to Plaintiffs; and (4) imposing unduly oppressive changes in the terms of Plaintiffs' tenancies, including unlawful rent increases, changes in the way rent was to be paid, and other policies that created difficulty for Plaintiffs.

477.   Plaintiffs have suffered harm as a result of Defendants' breach of the covenant of quiet enjoyment.

# SIXTH CAUSE OF ACTION

## (Individual Plaintiffs Against All Defendants for Private Nuisance, Cal. Civ. Code § 3479)

478.   Plaintiffs reallege and incorporate by reference each paragraph previously alleged in this Complaint.

479.   Defendants injured the Individual Plaintiffs by interfering with Plaintiffs' use and enjoyment of their leased residential units, constituting a private nuisance in violation of California Civil Code § 3479.

Complaint

480.   Defendants, by acting or failing to act, created conditions or permitted conditions to exist that are harmful to health, indecent and offensive to the senses, and are an obstruction to the free use of property, so as to interfere with comfortable enjoyment of life or property. Specifically, Defendants have created such conditions by, among other things, (1) failing to maintain Plaintiffs' units in habitable condition; (2) making false, threatening, and derogatory statements to Plaintiffs; and (3) imposing unduly oppressive changes in the terms of Plaintiffs' tenancies, including unlawful rent increases, changes in the way rent was to be paid, and other policies that created difficulty for Plaintiffs.

481.   These conditions have interfered with Plaintiffs' use and enjoyment of their units, and Plaintiffs did not consent to Defendants' conduct. Moreover, an ordinary person would be reasonably annoyed or disturbed by Defendants' conduct.

482.   As a result of Defendants' conduct, Plaintiffs have suffered harm, and the seriousness of that harm outweighs the public benefit of Defendants' conduct. Indeed, there is no social value to Defendants' unlawful actions.

## SEVENTH CAUSE OF ACTION

**(Individual Plaintiffs Against All Defendants for Negligence, Cal. Civ. Code § 1714)**

483.   Plaintiffs reallege and incorporate by reference each paragraph previously alleged in this Complaint.

484.   Defendants injured the Individual Plaintiffs by want of ordinary care or skill in the ownership or management of their property, person, or agents in violation of Cal. Civ. Code § 1714.

485.   Defendants were negligent because, as stated above, (1) Defendants violated the FHA, 42 U.S.C. §§ 3601-3619 & 24 C.F.R. §§ 100.60-100.85; the FEHA, Cal. Gov't Code §§ 12900-12996; and the Unruh Civil Rights Act, Cal. Civ. Code § 51; (2) Defendants' statutory violations were a substantial factor in bringing about the harm suffered by Plaintiffs, including both economic loss and emotional

distress; (3) the FHA, FEHA, and Unruh Civil Rights Act were intended to prevent actions like those of Defendants; and (4) the FHA, FEHA, and Unruh Civil Rights Act were intended to protect persons like the Individual Plaintiffs.

486.   Defendants also were negligent because, as stated above, (1) they failed to exercise ordinary skill or care to prevent or remedy the defective conditions that rendered Plaintiffs' units uninhabitable, including failing to substantially meet the standards set forth in Cal. Civ. Code § 1941.1 and Cal. Health and Safety Code § 17920.3; and (2) Defendants' failure to exercise ordinary skill or care was a substantial factor in bringing about the harm suffered by Plaintiffs, including both economic loss and emotional distress.

## EIGHTH CAUSE OF ACTION

**(Plaintiffs Martinez, Velasquez, Fabian, Ramos, Reynolds, Rivera, Deras, Castro, Carlos Escamilla, Francesca Escamilla, Hernandez, Allen, and Prudhomme Against All Defendants for Charging LARSO Excessive Rent, L.A. Mun. Code § 151.10(A))**

487.   Plaintiffs reallege and incorporate by reference each paragraph previously alleged in this Complaint.

488.   As stated above, Defendants demanded payment of rent in excess of the maximum rent or maximum adjusted rent in violation of the provisions of the Los Angeles Rent Stabilization Ordinance, or any regulations or orders promulgated hereunder. Defendants sent notices of illegal rent increases, and/or additional charges for water/trash collection to Plaintiffs Martinez, Velasquez, Fabian, Ramos, Reynolds, Rivera, Deras, Castro, Carlos and Francesca Escamilla, Hernandez, Allen, and Prudhomme.

## NINTH CAUSE OF ACTION

**(Individual Plaintiffs Against All Defendants for Violations of the California Anti-Harassment Statute, Cal. Civ. Code § 1940.2)**

489.  Plaintiffs reallege and incorporate by reference each paragraph previously alleged in this Complaint.

490.  As stated above, Defendants have used threats of eviction, given certain Plaintiffs unlawful eviction notices that were not served in good faith or in anticipation of litigation that was seriously contemplated at the time, made menacing comments (such as threats to call immigration and social services), and participated in menacing conduct (such as refusing to provide reasonable accommodations and refusing to permit entry for locked-out tenants).

491.  Defendants' actions were menacing and have deprived the Individual Plaintiffs of the quiet enjoyment of their homes and caused Plaintiffs stress, instability, and in some cases worsened health.

492.  Defendants' actions were conducted in an effort to effectuate their "Koreatown Strategy", and Defendants therefore sought to disrupt Plaintiffs' tenancies and influence Plaintiffs to vacate their homes in order to make a greater profit on their properties.

## TENTH CAUSE OF ACTION

**(Individual Plaintiffs Against All Defendants for Retaliation, Cal. Civ. Code § 1942.5(c))**

493.  Plaintiffs reallege and incorporate by reference each paragraph previously alleged in this Complaint.

494.  Defendants, who are lessors under the law, retaliated against the Individual Plaintiffs by, among other things, increasing rent, decreasing services (including forcing Plaintiffs to physically travel to pay rent, charging trash and water fees, failing to maintain units in habitable condition, and refusing to permit pets), and

by giving certain Plaintiffs baseless eviction notices that were not served in good faith or in anticipation of litigation that was seriously contemplated at the time.

495.   Defendants so acted for the purpose of retaliation, and Defendants' actions were intended as punishment for Plaintiffs exercising their legal rights by complaining about the condition of their rental units, after Plaintiffs caused the Department of Public Health and HCIDLA to inspect their rental units, and after Plaintiffs sought reasonable accommodations for their disabilities or on behalf of their children. Each of the Plaintiffs exercised his or her rights in complaining to Defendants to secure quiet enjoyment of his or her rental properties.

496.   Plaintiffs' protected actions occurred within six months of Defendants' retaliatory reactions.

## ELEVENTH CAUSE OF ACTION

**(All Plaintiffs Against All Defendants for Unfair Competition, Cal. Bus. & Prof. Code §§ 17200-17210)**

497.   Plaintiffs reallege and incorporate by reference each paragraph previously alleged in this Complaint.

498.   Defendants have engaged in unlawful business practices by employing menacing conduct in an effort to remove Plaintiffs from their rental homes through harassment, by distributing unlawful eviction notices and threats in violation of FHA and FEHA, and by violating state and local laws requiring that Defendants meet habitability requirements and permit Plaintiffs quiet enjoyment of their rental properties.

499.   Defendants have additionally engaged in an unfair business practice by issuing to Plaintiffs Allen, Deras, Martinez, Prudhomme, Reynolds, Rivera, and Velasquez baseless eviction notices that were not served in good faith or in anticipation of litigation that was seriously contemplated at the time.

500.   Defendants engaged in unlawful, unfair, and deceptive business practices by serving Plaintiff tenants with notices that purported to effect changes

that were not permitted by law, including the termination of Section 8 subsidies, the application of "move-out dates" notwithstanding Plaintiffs' continuing right to remain in their units, and the imposition of invalid rent increases or additional charges for utility services.

501.   Defendants engaged in a further unfair business practice by imposing unconscionable changes to the rent collection terms in each of their buildings. Defendants imposed these rent collection terms without negotiation, through the exercise of their superior bargaining power, and in a context where Plaintiff tenants, locked into a landlord-tenant relationship with Defendants, had no meaningful choice. Further, by breaking with long-established practice and lacking in reasonable justification, the changed rent collection terms fell outside of Plaintiff tenants' reasonable expectations. By requiring Plaintiff tenants to incur additional costs to comply with the new terms, on the pain of facing eviction, the new rent collection terms unfairly placed the risk of loss on Plaintiff tenants.

502.   Defendants' conduct is immoral, unethical, unscrupulous, and substantially injurious to consumers, and the harm to Plaintiffs outweighs any conceivable utility from Defendants' actions. Moreover, because Plaintiffs live in buildings currently or formerly owned and managed by Defendants, and because Plaintiffs were not at fault or responsible for the oppressive practices described herein, Plaintiffs could not have reasonably avoided the injury caused by Defendants' unfair business practices.

503.   Defendants' unlawful actions have caused economic injuries to Plaintiffs, including requiring them to make unnecessary travel to Century City, forcing them to incur unlawful costs (including the cost of certified mailing, repairs, and unlawful water and trash collection fees), causing them a loss of use and enjoyment of their rental property, and resulting in the payment of excess rent in light of the substandard and uninhabitable conditions of Plaintiffs' units.

504. Defendants' unlawful and unfair business practices, including discriminating against SAJE members and giving SAJE members misleading notices and seeking retaliatory evictions, have caused SAJE to lose significant economic resources, including staff time, to protect the tenants of the Magnolia building, constituting economic injury.

505. Defendants' unlawful and unfair business practices, including discrimination and harassment against Step Up clients Rivera and Reynolds, and refusing to provide Step Up with information that Step Up requires to complete its mission, have caused Step Up economic injury, including lost staff time and lost organizational resources.

## **RELIEF SOUGHT**

506. Plaintiffs seek an order from the Court:

(a) Issuing a declaratory judgment in favor of Plaintiffs;

(b) Granting permanent injunctive relief enjoining Defendants from taking further actions which will displace or harm Plaintiffs;

(c) Awarding damages to Plaintiffs, including compensatory damages to organizational Plaintiffs SAJE and Step Up equal to the diversion of organizational resources and frustration of mission damages incurred as a result of Defendants' actions;

(d) Awarding restitution of excess rent paid by Plaintiff tenants pursuant to Cal. Bus. & Prof. Code § 17200 *et seq.*;

(e) Awarding punitive and exemplary damages to Plaintiffs pursuant to 42 U.S.C. § 3613(c) and Cal. Civ. Code §§ 1942.5(f) and 3294(a).

(f) Awarding costs and attorney fees to Plaintiffs pursuant to 42 U.S.C. § 3613, Cal. Civ. Proc. Code § 1021.5, Cal. Civ. Code §§ 1717, 1942.5(h), and any other relevant law authorizing such relief; and

(g) Granting such further relief as the Court may deem just.

1

# **JURY TRIAL DEMANDED**

2

507.   Plaintiffs demand a jury on all issues so triable.

3

4

All signatories listed, and on whose behalf the filing is submitted, concur in

5

the filing's content and have authorized the filing.

6

7

Respectfully submitted,

8

9

Dated:  November 17, 2016          PUBLIC COUNSEL

10

*/s/ Deepika Sharma*
_____

11

Mark D. Rosenbaum
Wilbert H. Watts

12

Deepika Sharma
Sarah E. Truesdell

13

Alisa L. Hartz
Marta A. Eggers

14

15

Dated:  November 17, 2016          SKADDEN, ARPS, SLATE, MEAGHER &
FLOM LLP

16

17

*/s/ Matthew E. Sloan*
_____

18

Matthew E. Sloan
Emily Ludmir Aviad

18

Daniel O. Blau

19

Ross M. Cuff
Rachael T. Schiffman

20

Antonieta M. Pimienta

21

Dated:  November 17, 2016          BRANCART & BRANCART

22

*/s/ Christopher Brancart*
_____

23

Christopher Brancart

24

Dated:  November 17, 2016          PUBLIC ADVOCATES INC.

25

26

*/s/ Anne P. Bellows*
_____

Anne P. Bellows

27

28

*Attorneys for Plaintiffs*

89

Complaint